# In re G-A-, Respondent

*Decided May 2, 2002*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

An Iranian Christian of Armenian descent demonstrated eligibility for deferral of removal under Article 3 of the Convention Against Torture and 8 C.F.R. § 208.17(a) (2001) by establishing that it is more likely than not that he will be tortured if deported to Iran based on a combination of factors, including his religion, his ethnicity, the duration of his residence in the United States, and his drug-related convictions in this country.

FOR RESPONDENT: Yvonne Floyd-Mayers, Esquire, New York, New York

FOR THE IMMIGRATION AND NATURALIZATION SERVICE:  David Suna, Assistant District Counsel

BEFORE:   Board En Banc:  SCIALABBA, Acting Chairman; DUNNE, Vice Chairman; SCHMIDT, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, GUENDELSBERGER, ROSENBERG, GRANT, MOSCATO, MILLER, BRENNAN, ESPENOZA, OSUNA, OHLSON, HESS, and PAULEY, Board Members.

GUENDELSBERGER, Board Member:

The Immigration and Naturalization Service appeals an Immigration Judge's June 4, 2001, decision granting the respondent's request for deferral of removal under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").  The Service's appeal will be dismissed.  The respondent's motion to file a late brief is granted.

## I.  FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Iran who entered the United States as a lawful permanent resident on October 16, 1976.  On September 11, 1985, the respondent was convicted in the United States District Court, Southern District of New York, of conspiracy to intentionally and knowingly possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) (1982).  The respondent received a 3-year sentence of

imprisonment, all but 6 months of which was suspended, and he was placed on 2½ years' probation. His sentence was subsequently reduced to 4 months of imprisonment.

On November 13, 1986, the Service issued an Order to Show Cause and Notice of Hearing (Form I-221) charging the respondent with deportability under section 241(a)(11) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(11) (1982), as an alien convicted of a controlled substance violation. In proceedings before the Immigration Judge, the respondent, through counsel, admitted the factual allegations contained in the Order to Show Cause and conceded deportability as charged. The Immigration Judge, who received extensive testimonial and documentary evidence in this case over the course of more than 12 years, concluded that the respondent established that he would likely be tortured by government authorities if returned to Iran. Therefore, the Immigration Judge granted the respondent deferral of removal to Iran under the Convention Against Torture and denied his requests for all other forms of relief.

## II. ISSUE ON APPEAL

The sole issue on appeal is whether the respondent has demonstrated that it is more likely than not that he would be tortured by Iranian authorities if he is deported to Iran, and that he therefore is eligible for deferral of removal under the Convention Against Torture.[1]

## III. ANALYSIS

Article 3 of the Convention Against Torture prohibits refoulement of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official. *See* 8 C.F.R. §§ 208.16(c)(4), 208.18(a) (2001); *Matter of S-V-*, Interim Decision 3430 (BIA 2000).[2] In determining whether an alien is

---

[1] The respondent argues in his brief on appeal that the Immigration Judge erred in concluding that he failed to demonstrate eligibility for relief under section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994), as a matter of discretion, and that he is ineligible for withholding of removal as an alien convicted of a particularly serious crime. However, the respondent failed to preserve these issues on appeal by filing a Notice of Appeal (Form EOIR-26) with the Board. Consequently, we decline to address the respondent's arguments concerning these alternative forms of relief from removal.

[2] "Torture" is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining information or a confession, imposing punishment for an actual or suspected act, intimidation or coercion, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation, or with the consent or acquiescence, of a public official or other person

(continued...)

entitled to protection under the Convention Against Torture, all evidence relevant to the possibility of future torture in the proposed country of removal shall be considered, including, but not limited to:  past torture inflicted upon the applicant; evidence that the applicant could relocate to another part of the country of removal where he or she is not likely to be tortured; gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in the country of deportation.  8 C.F.R. § 208.16(c)(3).  An alien's criminal convictions in the United States, however serious, are not a bar to deferral of removal under the Convention Against Torture.  *See* 8 C.F.R. § 208.17(a) (2001).

We find that the Immigration Judge, in a comprehensive and well-reasoned decision, thoroughly evaluated the evidence presented by the respondent in support of his deferral of removal claim.  The Immigration Judge concluded that

> it is this Court's belief, based upon the background material, . . . that Christians, such as the respondent, who have applied for asylum outside of Iran, who have spent an appreciable amount of time in the United States, and who have been convicted of a drug trafficking offense or offenses would be subjected to torture.  It is this Court's belief that it is more likely than not that that would occur.

We discern no error in the Immigration Judge's decision, and we likewise find that the evidence of record, when considered in the aggregate, supports the respondent's contention that he would more likely than not be tortured upon his return to Iran.

The respondent is an Iranian Christian of Armenian descent who has lived in the United States for more than 25 years, and who has been convicted of violating this country's controlled substance laws.  The Immigration Judge found that the evidence of record supports the respondent's assertion that Armenian Christians are subject to harsh and discriminatory treatment in Iran, that persons associated with narcotics trafficking face particularly severe punishment, and that Iranians who have spent an extensive amount of time in the United States are perceived to be opponents of the Iranian Government or even pro-American spies.  The combination of these traits, and the evidence of widespread use of torture in Iran, leads us to conclude that the respondent is likely to be subjected to torture if deported to Iran.

In particular, the *1999 Country Reports on Human Rights Practices*, which are released by the United States Department of State, indicate that "[s]ystematic abuses include extrajudicial killings and summary executions; disappearances; *widespread use of torture and other degrading treatment*, reportedly including rape; harsh prison conditions; arbitrary arrest and detention, and prolonged use of incommunicado detention."  Bureau of

---

[2] (...continued)
acting in an official capacity.  8 C.F.R. § 208.18(a)(1).

Democracy, Human Rights, and Labor, U.S. Dep't of State, *Iran Country Reports on Human Rights Practices - 1999* 1-2 (Feb. 25, 2000), *available at* http://www.state.gov/g/drl/rls/hrrpt/1999/409.htm, *reprinted in* Committees on International Relations and Foreign Relations, 106th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1999* 2050 (Joint Comm. Print 2000) (hereinafter "*1999 Country Reports*") (emphasis added); *see also Matter of T-M-B-*, 21 I&N Dec. 775, 779 (BIA 1997) (finding that country profiles submitted by the Department of State are entitled to considerable deference in the absence of contradictory evidence), *rev'd on other grounds*, *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999). The State Department notes that the country's judiciary is subject to government and religious influence and that it fails to ensure due process or fair trials. "Citizens continued to be tried and sentenced to death in the absence of sufficient procedural safeguards," and many criminal offenses result in harsh punishments, including stoning and flogging. *1999 Country Reports*, *supra*, at 2.

We credit the respondent's testimony that if he is returned to Iran, he would be identifiable by government authorities at the airport as a non-Muslim ethnic minority, and that he would come to the officials' attention because of his many years in the United States. According to the respondent, he is easily identifiable as an ethnic Armenian by his fair skin, his accent, and his surname, which also reveals him to be a Christian. He asserted that these factors, along with his lengthy residence in the United States and apparent loss of legal status–as evidenced by his deportation–would focus the attention of the authorities on him. Moreover, once he is detained and investigated, the respondent believes that both his criminal history and his attempt to apply for asylum in the United States would be discovered, and that he would likely be "subject to torture or death" as a consequence of "being deported with a drug conviction."

The State Department confirms that Iranian citizens returning from abroad are "subject to search and extensive questioning by government authorities for evidence of antiregime activities abroad." *1999 Country Reports*, *supra*, at 19. This practice is also described in a 1998 report relied on by the Immigration Judge, which is entitled *The Status of Human Rights of Ethnic Armenian/Assyrian Christians in the Islamic Republic of Iran*, prepared by Iranian Christians International, Inc. (hereinafter "*Human Rights Report*"). According to the report, "It is well known that the Islamic Republic of Iran has arrested, imprisoned, tortured, and sometimes killed Iranians who were forcibly returned to Iran after departing Iran unlawfully, staying abroad without authorization, and/or *applying for asylum in another country*." *Id.* at 26 (emphasis added). The document recounts the experiences of several ethnic Armenian Christians who, upon returning to Iran, were interrogated, imprisoned, tortured, and even executed by government authorities. *Id.* Moreover, the State Department reports that even United States citizens of

Iranian origin have been detained and harassed by government authorities. U.S. Dep't of State, *Iran-Travel Warning* (Sept. 14, 1999), *available at* http://travel.state.gov/iran_warning.html. Thus, we find that the respondent would be subjected to close scrutiny upon his return after spending 25 years in the United States, and he would likely be detained and interrogated as a result.

We find further that, if the respondent were arrested and detained upon his return, his fate would likely include torture, as "there are numerous, credible reports that security forces and prison personnel continue to torture detainees and prisoners." *1999 Country Reports*, *supra*, at 4. Common methods of torture include "suspension for long periods in contorted positions, burning with cigarettes, sleep deprivation, and, most frequently, severe and repeated beatings with cables or other instruments on the back and on the soles of the feet." *Id.* Other reported abuses include beatings about the ears, resulting in partial or complete deafness, and punching in the eyes, leading to partial or complete blindness. *Id.* Such treatment, which is intentionally and deliberately inflicted on detainees by Iranian prison authorities, constitutes torture as defined in the regulations. *See* 8 C.F.R. § 208.18(a)(1); *cf. Matter of J-E-*, 23 I&N Dec. 291, 301 (BIA 2002) (finding that isolated instances of mistreatment in Haitian prisons do not rise to the level of "torture" as defined in 8 C.F.R. § 208.18(a)(1)).

The State Department's *1999 Country Reports* are also replete with references to the discriminatory treatment faced by ethnic and religious minorities in Iran. "Religious minorities . . . continued to suffer repression by conservative elements of the judiciary and security establishment." *1999 Country Reports*, *supra*, at 2. In particular, the Government "frequently charges members of religious minorities with crimes such as 'confronting the regime' and apostasy," and trials of individuals so accused are conducted "in the same manner as is reserved for threats to national security." *Id.* at 8. Although the Iranian Constitution prohibits arbitrary arrest and detention, "these practices remain common. There is reportedly no legal time limit on incommunicado detention . . . [and] [p]risoners also may be denied visits by family members and legal counsel." *Id.* at 5. Moreover, "[c]itizens continued to be tried and sentenced to death in the absence of sufficient procedural safeguards." *Id.* at 2.

In addition, the *Human Rights Report* contained in the record indicates that persecution against Armenian Christians in particular is currently on the rise. The document states that "Iran's medieval law with regard to the punishment of criminals is very punitive and there is strong discrimination against non-Muslims. . . . Christians suffer the constant threats of harassment, physical abuse, kidnaping and forced marriage–all methods of coercion that are supported by the Islamic Iranian government." *Human Rights Report*, *supra*, at 12, 14. According to this law, "those who are not Muslims are

considered strictly heathen. . . . The punishment of a heathen who commits a crime against a Muslim is definitely heavier than the punishment against a Muslim who commits a crime against a heathen." *Id.* at 12. The Department of State *2000 Country Reports* announced an increase in the persecution of religious minorities in Iran. *See* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *2000 Country Reports on Human Rights Practices - Iran* (Feb. 23, 2001), *available at* http://state.gov/g/drl/rls/hrrpt/2000/nea/786.htm, *reprinted in* Committees on Foreign Relations and International Relations, 107th Cong., 1st Sess., *Country Reports on Human Rights Practices for 2000* 1869 (Joint Comm. Print 2001). Thus, the evidence indicates that Christians are subject to discrimination and abuse whether or not they engage in proselytization.

Although we in no way condone the respondent's reprehensible criminal behavior in the United States, his fear of torture in Iran appears justified in light of the background country evidence presented. The State Department reports that "[t]he judiciary suffers from government and religious influence, and does not ensure that citizens receive due process or fair trials." *1999 Country Reports*, *supra*, at 2. If arrested and criminally charged, the respondent would likely be tried in the Islamic Revolutionary Courts, which were established to try offenses viewed as "potentially threatening to the Islamic Republic," including narcotics crimes. *Id.* at 6. He would enjoy few rights before such a tribunal, which "are notorious for their disregard of international standards of fairness." *Id.* Pretrial detention "often is prolonged" and defendants lack access to attorneys. *Id.* In addition, "[i]ndictments often lack clarity and include undefined offenses such as 'antirevolutionary behavior,' 'moral corruption,' and 'siding with global arrogance.'" *Id.* Persons convicted of narcotics trafficking are routinely executed.

Finally, the materials submitted describe conditions in Iranian prisons as extremely harsh and note that some prisoners are held in solitary confinement or denied adequate food or medical care in order to force confessions. Certain facilities "are notorious for the cruel and prolonged acts of torture inflicted" upon prisoners, particularly perceived opponents of the Government. *Id.* at 4. The State Department notes that prison guards reportedly "torture detainees in the presence of family members." *Id.* at 5. Moreover, Iranian authorities do not permit nongovernmental organizations, such as the International Committee for the Red Cross ("ICRC") or the United Nations High Commissioner for Refugees ("UNHCR") to visit prisons and detention centers, monitor conditions, or meet with prisoners. *See id.* at 21; *cf. Matter of J-E-*, *supra*, at 301 (noting with approval that the Haitian government freely permits the ICRC and other groups to enter the country's prisons and assist prisoners with medical care, food, and legal aid).

The evidence in this case indicates that deliberate acts of torture are pervasive and widespread in Iranian prisons, that the authorities use torture as a matter of policy, and that meaningful international oversight or intervention is lacking. *Cf. Matter of J-E-*, *supra*, at 303. As noted, prisoners are routinely suspended from ropes, burned with cigarettes, whipped with cables, beaten about the ears, and punched in the eyes. Such abuse is "widespread" and perpetrators of torture "often commit[] such abuses with impunity." *1999 Country Reports*, *supra*, at 1-2. The respondent has demonstrated that severe instances of mistreatment are so pervasive in Iranian prisons as to establish a probability that a detainee with the respondent's characteristics will be subject to torture as defined in 8 C.F.R. § 208.18(a), as opposed to other acts of cruel, inhuman, or degrading punishment or treatment. *Cf. Matter of J-E-*, *supra*, at 303 (finding that the respondent failed to demonstrate eligibility for Convention Against Torture protection where the evidence of Haitian prison conditions indicated only "isolated allegations of misconduct that rise to the level of torture"); *see also Al-Saher v. INS*, 268 F.3d 1143 (9th Cir. 2001) (finding an Iraqi national eligible for protection under Article 3 of the Convention Against Torture where he established that he was likely to be detained by Iraqi authorities, and the record indicated that the security services routinely tortured detainees and that Iraqi refugees often reported instances of torture).

Consequently, having examined all of the evidence presented, we conclude that the respondent has demonstrated that he is likely to be tortured in his homeland based on the combination of factors presented, including his religion, his ethnicity, the duration of his residence in the United States, and his drug-related convictions in this country. We will therefore uphold the decision of the Immigration Judge.

## IV. CONCLUSION

Based on the foregoing, we concur with the Immigration Judge's conclusion that it is more likely than not that the respondent will be subjected to torture by, or with the acquiescence of, a public official if he is deported to Iran. The respondent has satisfied his burden of proving eligibility for deferral of removal under the Convention Against Torture. *See* 8 C.F.R. §§ 208.16(c)(2), 208.18(a); *see also Matter of S-V-*, *supra*, at 7-9. Accordingly, the Service's appeal will be dismissed.

**ORDER:** The appeal of the Immigration and Naturalization Service is dismissed.