# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2250
_____

Abdullahi Jamale Jama

*Petitioner*

v.

Monty Wilkinson, Acting Attorney General of the United States

*Respondent*[1]

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 23, 2020
Filed: March 11, 2021

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Abdullahi Jamale Jama, a native and citizen of Somalia, petitions for review of an order of the Board of Immigration Appeals (BIA). This order upheld the decision of an immigration judge (IJ) ordering Jama to be deported and removed to

---

[1]Respondent Wilkinson is automatically substituted for his predecessor under Federal Rule of Appellate Procedure 43(c)(2).

Somalia and denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). For the following reasons, we deny the petition for review.

I.

Jama was born in Mogadishu, Somalia, on January 1, 1988. He and his three sisters fled to Kenya in 1991, after the loss of their father and brothers in the Somali civil conflict and the disappearance of their mother. In October 1998, he arrived in the United States and was admitted as a refugee. Jama suffers from physical and mental disabilities. He has limited mobility in his right arm due to a gunshot wound and difficulty walking due to a fall from a third-floor balcony. He further suffers from anxiety, depression, and post-traumatic stress disorder.

Jama began developing a criminal history in 2006. In February 2011, Jama was convicted of felony motor vehicle theft, in violation of Minn. Stat. § 609.52, subdiv. 2, cl. (17). As a result, the Department of Homeland Security (DHS) charged Jama with removability, under 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(G), as a noncitizen[2] convicted of an aggravated felony. The IJ ordered Jama removed *in absentia* on February 4, 2013, after he failed to appear at multiple hearings. Jama subsequently sustained additional criminal convictions. Most significantly, he was convicted of second-degree felony assault, in violation of Minn. Stat. § 609.222, subdiv. 1, in April 2013.

In April 2018, Jama, through counsel, moved to rescind the February 2013 *in absentia* removal order, explaining that he had been in state custody at the time of the proceedings and was unable to attend. Alternatively, he sought to reopen the removal proceedings based on changed country conditions to apply for asylum, withholding of removal, and protection under CAT. The IJ granted the motion to

_____

[2]The United States Code and the accompanying federal regulations use the term "alien." This opinion maintains that nomenclature when quoting directly from the text or case law; otherwise it replaces "alien" with "noncitizen."

rescind and reopened the proceedings. During these proceedings, DHS charged Jama with an additional ground for removability, under 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(F), based on Jama's second-degree felony assault conviction. On July 26, 2018, the IJ held a hearing on the merits of Jama's case. The IJ considered a voluminous amount of documentary evidence, including an affidavit by Dr. Massimiliano Reggi, and heard testimony from Jama and Dr. Abas Mohamed Jama (no relation), an expert in mental health treatment in Somalia. The IJ found both Jama and Dr. Jama to be credible.

In its written decision, the IJ noted that Jama had conceded removability, under § 1227(a)(2)(A)(iii), as a noncitizen convicted of a theft-offense aggravated felony, as defined at § 1101(a)(43)(G), based on his felony motor vehicle theft conviction.[3] The IJ then determined that Jama was further removable, under § 1227(a)(2)(A)(iii), as a noncitizen convicted of a crime of violence, as defined at § 1101(a)(43)(F), based on his second-degree felony assault conviction. The IJ found that these aggravated felony offenses subjected Jama to the asylum "particularly serious crime" bar, under § 1158(b)(2)(A)(ii), (B)(i), making him ineligible for relief. The IJ next considered whether Jama's second-degree felony assault conviction was a "particularly serious crime," under § 1231(b)(3)(B)(ii), barring withholding of removal status.[4] The IJ found that, as a crime against persons,

---

[3]Jama contends that he did not concede removability; however, the BIA noted that Jama did not contest removability on appeal. Admin. R. 3.

[4]For clarification, 8 U.S.C. §§ 1158 and 1231 establish distinct "particularly serious crime" bars for asylum and withholding of removal, respectively, and each apply a slightly different standard. Section 1158 bars noncitizens who have been convicted of "an aggravated felony" or an offense designated as a particularly serious crime by the Attorney General from receiving asylum. Id. § 1158(b)(2)(A)(ii), (B). Section 1231 bars noncitizens from receiving statutory withholding of removal who have been convicted of "an aggravated felony (or felonies) for which the noncitizen has been sentenced to an aggregate term of imprisonment of at least 5 years," id. § 1231(b)(3)(B)(ii), or an offense that otherwise qualifies based on "the individual facts and circumstances," Marambo v.

Jama's conviction was within the ambit of particularly serious crimes, requiring the IJ to look at the nature of the conviction and the underlying facts, pursuant to In re N-A-M-, 24 I. & N. Dec. 336, 342 (BIA 2007). The amended criminal complaint underlying his conviction reported, *inter alia*, that Jama had threated a female victim's life by waiving a knife at her on two occasions. In response, Jama testified about his struggles with mental health and also claimed that he was attempting to help the victim by preventing her from taking Vicodin. The IJ found that struggles with mental health were not to be considered under Matter of G-G-S-, 26 I. & N. Dec. 339 (BIA 2014), and determined that Jama's second-degree felony assault was a particularly serious crime, barring him from withholding of removal.

The IJ then addressed Jama's claim for deferral of removal under CAT. Jama claimed that he would be tortured on account of his mental illness if returned to Somalia. Jama claimed that it was more likely than not that he would be institutionalized, where he would likely be chained. Considering the expert testimony and documentary evidence, the IJ found that while the Somali health system was weak and underfunded, significant progress had been made in the area of mental illness treatment. The IJ specifically found that these advancements negated the likelihood of torture and the government's alleged acquiescence in such torture. Jama also expressed fear of torture by al-Shabaab, but the IJ determined that these incidents of torture were too generalized and occurred at a relatively low rate. The IJ also determined that the government was actively fighting al-Shabaab, rather than acquiescing to al-Shabaab's activities. Therefore, the IJ found that Jama had failed to show that the risk of torture was more likely than not to occur upon Jama's return to Somalia and, accordingly, denied relief.

Jama appealed the decision to the BIA. Specifically, Jama argued that the IJ did not adequately consider the expert witnesses' testimony, erred in concluding that his convictions rendered him ineligible for asylum and withholding of removal, and

_____

Barr, 932 F.3d 650, 655 (8th Cir. 2019) (citation omitted). The § 1231 bar also applies to CAT withholding of removal. 8 C.F.R. § 1208.16(d)(2).

ignored evidence that he would face torture in Somalia. The BIA found that while the IJ did not specifically adopt all the expert testimony, the IJ expressed its consideration of that evidence by referring to it throughout the opinion. The BIA next found that the IJ did not err in characterizing Jama's second-degree felony assault conviction as a particularly serious crime in either the asylum or the withholding of removal contexts. First, the BIA determined that the aggravated felony was a categorical match to the generic definition of a crime of violence, as previously determined by this Court in United States v. Lindsey, 827 F.3d 733 (8th Cir. 2016), barring asylum relief. The BIA further affirmed the IJ's determination that the crime was a particularly serious crime for withholding of removal purposes. The BIA noted that Matter of G-G-S- foreclosed the consideration of mental health evidence in its determination but nonetheless concluded that Jama had not submitted sufficient evidence to show that his mental illness mitigated the dangerousness of his actions. Finally, the BIA found that the IJ did not clearly err in determining that Jama would not more likely than not be tortured with the acquiescence of the Somali government upon his return. Accordingly, the BIA affirmed the IJ on all claims and dismissed Jama's appeal.

II.

Jama argues that the BIA erred in finding (1) that his second-degree felony assault conviction is a particularly serious crime that bars statutory withholding of removal; (2) that his conviction also barred withholding of removal under CAT; and (3) that the evidence was insufficient to grant him deferral of removal under CAT. While "we ordinarily review only the BIA's decision, 'we also review the IJ's decision as part of the final agency action' if 'the BIA adopted the findings or the reasoning of the IJ.'" Etenyi v. Lynch, 799 F.3d 1003, 1006 (8th Cir. 2015) (citation omitted).

## A.

Jama first challenges the IJ and the BIA's denial of statutory withholding of removal. Our jurisdiction to review Jama's statutory withholding of removal claim "is limited to constitutional claims and questions of law" because Jama "is removable as a 'criminal alien.'" Constanza v. Holder, 647 F.3d 749, 753 (8th Cir. 2011) (per curiam); 8 U.S.C. § 1252(a)(2)(C)-(D). "We review the BIA's legal determinations 'de novo, according substantial deference to the BIA's interpretation of the statutes and regulations it administers.'" Sharif v. Barr, 965 F.3d 612, 618-19 (8th Cir. 2020) (citation omitted). A noncitizen is entitled to statutory withholding of removal if "the Attorney general decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). However, a noncitizen is barred from such relief "if the Attorney General decides that the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Id. § 1231(b)(3)(B)(ii).

Jama first contends that the IJ and the BIA did not consider the elements of his second-degree felony assault conviction before considering the underlying facts in determining whether it was a particularly serious crime. If the conviction is not a per se particularly serious crime under § 1231(b)(3)(B), the IJ must determine whether "the elements of the offense . . . potentially bring the crime into a category of particularly serious crimes." In re N-A-M-, 24 I. & N. Dec. at 342; see also Marambo v. Barr, 932 F.3d 650, 655 (8th Cir. 2019). If so, the IJ further considers "a variety of factors and . . . the individual facts and circumstances [of the conviction]." Marambo, 932 F.3d at 655 (second alteration in original) (citation omitted). Here, the IJ did not err in its analysis. The IJ recited the aforementioned legal framework and noted that "[c]rimes against persons are more likely to be categorized as 'particularly serious crimes.'" Admin. R. 157 (alteration in original) (quoting Matter of Frentescu, 18 I. & N. Dec. 244, 247 (BIA 1982)). After having already conducted a detailed analysis of the relevant Minnesota statute for the

purposes of removability, the IJ found that "[t]he statutory language . . . explicitly and unequivocally reflects that such offenses punishable under the statute inherently involve crimes against persons." Admin. R. 157. Therefore, the IJ and the BIA did not err in conducting the particularly serious crime analysis.

Jama next argues that the IJ and the BIA impermissibly afforded unreliable evidence—Jama's state court amended criminal complaint—greater weight than Jama's testimony. Jama specifically contends that the police reports underlying the amended criminal complaint are unproven and would not be admissible under the Federal Rules of Evidence or to determine deportability. While the Federal Rules of Evidence may be instructive to determine "whether [evidence] is probative and its admission is fundamentally fair," "[i]t is well established that the [Rules] are not binding in immigration proceedings." Matter of Y-S-L-C-, 26 I. & N. Dec. 688, 690 (BIA 2015). Moreover, the IJ may not consider police reports when initially determining whether a noncitizen is removable under § 1227(a)(2) because the "focus [is] on a criminal conviction, rather than on an alien's conduct." Matter of Teixeira, 21 I. & N. Dec. 316, 321 (BIA 1996). However, when determining whether to grant a noncitizen discretionary relief, such as here, the IJ "may consider police reports" where "evidence of criminal activity should be considered." Id. Other than this attack on police reports generally, Jama offers no specific reason why the facts of the at-issue police report should be deemed "unreliable." We have recognized that "all reliable information may be considered in making a particularly serious crime determination," including "information outside the confines of a record of conviction." Marambo, 932 F.3d at 655 (citation omitted). In Marambo v. Barr, we determined that the IJ did not err in considering law enforcement officers' observation set forth in the criminal complaint when conducting its particularly serious crime analysis. Id. at 656. We see no reason in Jama's case to now decide otherwise. To the extent that Jama challenges the inferences the IJ drew from specific evidence, we are precluded from reviewing such factual determinations in the statutory-withholding-of-removal context. See id. Accordingly, the IJ and the BIA did not err in considering the police reports underlying Jama's complaint.

Jama next contends that the IJ erred in excluding his evidence of struggles with mental health, pursuant to Matter of G-G-S-, 26 I. & N. Dec. 339 (BIA 2014), in their § 1231 particularly serious crime analyses. Once the IJ determines that the conviction possibly falls within the category of particularly serious crimes, the IJ must employ a factor-intensive inquiry to determine whether such conviction is a particularly serious crime. Marambo, 932 F.3d at 655. These factors include "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." Tian, 576 F.3d at 897 (quoting In re Frentescu, 18 I. & N. Dec. at 247). In weighing these factors, "all reliable information may be considered . . . , including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." Marambo, 932 F.3d at 655 (quoting In re N-A-M-, 24 I. & N. Dec. at 342). As such, we recently rejected the categorical bar to mental health evidence as articulated under Matter of G-G-S-. See Shazi v. Wilkinson, No. 19-2842 (Feb. 11, 2021).

Here, the IJ explicitly excluded the evidence of Jama's struggles with mental health, citing Matter of G-G-S-, but this error is of little consequence. On appeal, the BIA alternatively found that Jama had "not submitted sufficient evidence to demonstrate that his mental illness provide[d] an explanation or a basis for mitigating the dangerousness of [his] actions." Admin. R. 5-6. While Jama contends that this constitutes impermissible fact-finding, the BIA merely determined that the evidence was insufficient as a matter of law to have any effect on the analysis.[5]

---

[5]The dissent likewise construes the BIA's review as invading the IJ's fact-finding province, but a precise demarcation of what constitutes a factual finding proves otherwise. Questions of fact are confined to "the 'what happened' of the case," see Upatcha v. Sessions, 849 F.3d 181, 185 (4th Cir. 2017), or, as so often occurs in immigration cases, the "what will happen" of the case. Here, the BIA did not determine whether or to what extent Jama's mental illness influenced his actions, nor could it as Jama only proffered evidence of his general struggle with mental health and how such conditions are treated in Somalia. See Shazi, No. 19-2842, at 10 ("We recognize that the focus of a particularly serious crime analysis is on the

Therefore, the BIA did not engage in impermissible fact-finding but instead corrected the legal error of the IJ's analysis. Accordingly, we find that the BIA did not err in finding that Jama's second-degree felony assault conviction is a particularly serious crime, barring statutory withholding of removal.

### B.

Jama next challenges the IJ and the BIA's denial of withholding of removal under CAT.[6]  A noncitizen may separately obtain withholding of removal under CAT by "establish[ing] that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2). However, this form of relief is likewise foreclosed by the particularly serious crime bar.  Id. § 1208.16(d)(2); 8 U.S.C. § 1231(b)(3)(B)(ii).  While we have already

nature of the crime and does not involve unrelated factors or offender characteristics that do not bear upon "the gravity of a crime." (citation omitted)); see also In re L-S-, 22 I. & N. Dec. 645, 651 (BIA 1999) ("This inquiry does not involve an examination of the respondent's family or community ties, or the risk of persecution in the alien's native county.").  Instead, the BIA found that evidence solely of Jama's *history* of mental illness—irrespective of its veracity—was itself legally insufficient to demonstrate that Jama's mental illness had any effect on the actions at issue.  In doing so, the BIA did not attempt to determine "what happened" and thus avoided impermissibly "reweighing the underlying evidence."  Waldron v. Holder, 688 F.3d 354, 361 (8th Cir. 2012).

[6]CAT encapsulates two forms of relief for noncitizens: withholding of removal and deferral of removal.  If the applicant meets their burden under CAT, withholding of removal is the mandated form of relief.  See 8 C.F.R. § 1208.16(c)(4). However, if an applicant is barred from such relief, e.g., for committing a particularly serious crime under § 1208.16(d)(2), the applicant is still entitled to deferral of removal after meeting their burden.  See id. § 1208.16(c)(4).  The only notable difference between the two forms of relief is the method by which such relief is terminated.  While DHS must generally move to reopen a case in compliance with §§ 1003.2, 1003.23 to terminate CAT withholding of removal, see id. § 1208.24(f), DHS need only comply with the lower standard established by § 1208.17(d) to terminate deferral of removal.

-9-

rejected Jama's legal claims, our jurisdiction extends to the IJ and the BIA's factual findings as they relate to Jama's avenues for relief under CAT. See Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020). We review the IJ and the BIA's findings of fact under the substantial evidence standard, whereunder the IJ and the BIA's findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Id. (citation omitted). Having found that the IJ permissibly relied on the police reports underlying Jama's amended criminal complaint and with no evidence compelling a contrary conclusion, we refuse to disturb the IJ and the BIA's determination that Jama committed a particularly serious crime. Id. Accordingly, the IJ and the BIA did not err in finding that the particularly serious crime bar foreclosed Jama's relief for withholding of removal under CAT.

C.

Finally, Jama challenges the IJ and the BIA's denial of deferral of removal under CAT, arguing that he sufficiently demonstrated that he would more likely than not be tortured upon his return to Somalia. A noncitizen may still be granted relief in the form of deferral of removal under CAT, even if a particularly serious crime bar applies. 8 C.F.R. § 1208.16(c)(4); id. § 1208.17. Again, the applicant must "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." Id. § 1208.16(c)(2); id. § 1208.17(a). Torture includes:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Id. § 1208.18(a)(1).

Jama frames most of his arguments as legal in nature, arguing that the IJ failed to adequately consider certain evidence. However, as the BIA noted, the IJ did consider all the relevant evidence as indicated by the references to the record within the IJ's decision. See Mayorga-Rosa v. Sessions, 888 F.3d 379, 384 (8th Cir. 2018) ("[A]n immigration judge has 'no duty to write an exegesis on every contention, [but must] consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and merely reacted.'" (alterations in original) (citation omitted)). Therefore, we find that the IJ and the BIA did not commit any legal error. See Sharif, 965 F.3d at 618-19 ("We review the BIA's legal determinations 'de novo, according substantial deference to the BIA's interpretation of the statutes and regulations it administers.'" (citation omitted)).

Substantively, Jama's arguments attack the IJ's findings of fact, which we grant substantial deference. See Nasrallah, 140 S. Ct. at 1692. To succeed on his CAT claim, Jama must have shown that it was more likely than not that he would be tortured in Somalia, 8 C.F.R. § 1208.16(c)(2), and that such torture would be at the hands of or acquiescence of the Somali government, see id. § 1208.18(a)(1). We need not address the likelihood that Jama will be tortured because substantial evidence supports the IJ and the BIA's finding that his torture would not be directed by or acquiesced to by the Somali government.

Jama presented two experts on mental health care in Somalia. Dr. Jama testified in the proceedings that there was an 80% or greater chance that Jama would be institutionalized and an 80%-90% chance that Jama would be chained in a mental health facility. Admin. R. 309. However, Dr. Jama also testified that the government does not regulate the mental health facilities, and he is not aware of Somali police or government officials placing mentally ill individuals in these facilities. Admin. R. 325-26. Dr. Reggi likewise declared that there was a 75% probability that Jama would be chained for a prolonged time, but he acknowledged that some public facilities have improved patient conditions, including one establishing a "chain-free environment," and that chaining is more prominent in

private facilities.  Admin. R. 427.  He further declared that the distinction between public and private facilities is illusory, noting for example that one "public" facility operated through "private fundraising and fees from the patient's families" and was more akin to "an overcrowded private facility."  Admin. R. 426.  The record evidence also supports the proposition that institutionalization and chaining largely occurs at the hands or direction of family members.  See, e.g., Admin. R. 323, 905.  Under our highly deferential review, we do not find that the record compels a conclusion contrary to the IJ and the BIA's findings.

Jama could nonetheless obtain relief if the Somali government acquiesces in torture by third parties.  "A government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but it does cross the line into acquiescence when it shows willful blindness toward the torture of citizens by third parties."  Moallin v. Barr, 980 F.3d 1207, 1210 (8th Cir. 2020) (citation omitted).  Jama contends that the government has been willfully blind to such torture by wholly ignoring the regulation of the mental health facilities.  However, the IJ illuminated the Somali government's slow but continual improvement in this sector.  Many developments, as Jama points out, are by the hands of nongovernment organizations and external actors, but we do not equate the government's reliance on external support as willful blindness, especially given Somalia's weak infrastructure eroded by years of civil conflict.  Admin. R. 881.  In fact, Dr. Jama indicated that Somalia's current infrastructure, or lack thereof, makes such healthcare reform impossible.  See Admin R. 325-26 ("[The government] cannot regulate [mental health facilities] . . . .  They don't have [the] ability to force any law.").  Even so, the IJ highlighted multiple ways the government itself has participated in the development of mental health care systems.  For example, the government has established three mental health departments, converted a prison to a mental health facility with the help of a nongovernment organization, partnered with international educators to provide mental health training in Somalia's main universities, and approved the country's first mental health policy.  Admin. R. 881-82.  Therefore, we do not find that the record evidence compels a finding that the Somali government has acquiesced in the torture, if any, that Jama would more likely

than not face.[7]  Accordingly, we refuse to disturb the IJ and the BIA's factual findings.

Jama also contends that he would be tortured by al-Shabaab on the basis "that he is a Westernized Somali or that he possesses a pro-government political opinion." Admin. R. 160-61.  On appeal, Jama has only challenged the IJ and the BIA's decision as it relates to the Somali government's acquiescence in such alleged torture.  See Pet'r's Br. 32.  However, the IJ also found that the violence perpetrated by al-Shabaab in Somalia is "indiscriminate" and the reports of torture of "perceived government collaborators" were of such "relatively low rate of incidence" that Jama had failed to establish that he would more likely than not face torture upon his return. Admin. R. 161.  Because Jama must show that there is (1) a likelihood of torture and (2) that such torture would occur at the hands of the Somali government, see 8 C.F.R. § 1208.18(a)(1), his failure to challenge the IJ's finding as it relates to the likelihood of the torture is fatal to his claim.  Therefore, we will not disturb the IJ and the BIA's findings.

Finally, Jama contends that the IJ and the BIA legally erred by failing to consider the aggregate risk of all the alleged methods of torture by all the alleged actors.  "The [BIA] has recognized that claims under CAT must be considered in

---

[7]That is not to say that we approve of Somalia's seemingly dismal healthcare system or are ignorant of the significant number of facts in the record, most of which the dissent highlights, detailing the incidents of chaining and the Somali government's alleged failure to modernize its approach to medicine.  While, before the IJ, Jama had to show that his torture and the government's consent or acquiescence was more likely than not to occur, his burden on appeal is significantly higher.  It is not enough for us to disagree with the BIA and find that such outcomes are likely, but instead "we must find that it would not be possible for any reasonable fact-finder to come to the conclusion reached by the [BIA]."  Menendez-Donis v. Ashcroft, 360 F.3d 915, 918 (8th Cir. 2004) ("[U]nder the substantial evidence standard we cannot substitute our determination for that of the administrative fact-finder just because we believe that the fact-finder is clearly wrong.").  At least with regard to the government's consent or acquiescence in such alleged torture, we are not so compelled.

terms of the aggregate risk of torture from all sources." Abdi Omar v. Barr, 962 F.3d 1061, 1065 (8th Cir. 2020). However, we have explained that "address[ing] risk factors individually . . . is not inconsistent with analyzing risk in the aggregate as long as the [IJ and BIA] ultimately consider[] all factors together." Moallin, 980 F.3d at 1210 (alterations in original) (quoting Abdi Omar, 962 F.3d at 1065)); Abdi Omar, 962 F.3d at 1065 ("If individual findings about particular risks are flawed, then of course it may follow that the aggregate finding is flawed as well."). On appeal, the BIA recognized each alleged basis of torture and adopted the IJ's reasoning. The IJ expressly noted that Jama had "failed to show individually, or cumulatively, that he will be more likely than not to experience torture for any reason." Admin. R. 161. Therefore, we do not find that the IJ and the BIA erred in considering the aggregate risk of torture.

## III.

Accordingly, we deny the petition for review.

KELLY, Circuit Judge, dissenting.

Abdullahi Jama, a 33-year-old resident of Minnesota, is at risk of deportation to Somalia, though he has not lived there for 30 years. Because I believe the BIA engaged in unauthorized factfinding in affirming the dismissal of his claims for withholding of removal, and because the record contains substantial evidence showing that he would likely be tortured by or with the consent of the Somali government, I respectfully dissent from the court's denial of Jama's petition for review.

## A.

"A noncitizen has two vehicles by which he can obtain withholding of removal—8 U.S.C. § 1231 (statutory withholding of removal) and CAT [Convention Against Torture]—and the particularly serious crime bar prohibits both." Shazi v.

-14-

Wilkinson, — F.3d —, No. 19-2842, 2021 WL 503288, at *2 (8th Cir. 2021) (citing 8 U.S.C. § 1231(b)(3)(B)(ii) and 8 C.F.R. § 1208.16(d)). The particularly serious crime inquiry is the same under either mechanism. "After determining that the elements of the offense potentially state a particularly serious crime, 'all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction.'" Marambo v. Barr, 932 F.3d 650, 655 (8th Cir. 2019) (quoting Matter of N-A-M, 24 I. & N. Dec. 336, 342 (BIA 2007)). Though I agree that the IJ and BIA properly considered the elements of Jama's second-degree felony assault conviction and the underlying police reports, I would grant the petition for review because the IJ excluded evidence of Jama's mental health history. See Shazi, — F.3d at —, 2021 WL 503288, at *5 (rejecting a categorical bar to considering mental health evidence in particularly serious crime inquiry).

The court reasons that the IJ's error was harmless because the BIA alternatively concluded that Jama had "not submitted sufficient evidence to demonstrate that his mental illness provide[d] an explanation or a basis for mitigating the dangerousness of [his] actions." In my view, though, the BIA exceeded the scope of its review in arriving at this conclusion. "[T]he BIA is limited to determining 'whether the [factual] findings of the immigration judge are clearly erroneous.'" Flores v. Holder, 699 F.3d 998, 1003 (8th Cir. 2012) (quoting 8 C.F.R. § 1003.1(d)(3)(i)). Although the ultimate determination of whether a conviction constitutes a "particularly serious crime" is a question of law, the underlying inquiry is fact-intensive, requiring the IJ to consider "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and most importantly, whether the type and circumstances of the crime indicate that the [noncitizen] will be a danger to the community." Tian v. Holder, 576 F.3d 890, 897 (8th Cir. 2009) (cleaned up); cf. Shazi, — F.3d at —, 2021 WL 503288, at *2 n.2 (noting that "the factual findings as they relate to a noncitizen's CAT claim" include those "underpinning the BIA's particularly serious crime determination"). Of course, the BIA has the discretion to reweigh the IJ's factual findings when

determining whether the noncitizen has been convicted of a "particularly serious crime." See Waldron v. Holder, 688 F.3d 354, 361 (8th Cir. 2012). "[B]ut there is a difference between weighing the factual findings of the IJ and reweighing *the underlying evidence and testimony behind those factual findings* to reach new factual conclusions." Id. (emphasis added). In this case, the BIA did the latter.

Though the IJ and BIA both concluded that Jama had committed a "particularly serious crime," the BIA's determination rested in part on a new factual inquiry regarding the effect of Jama's mental illness on the likelihood that he would be a danger to the community. The IJ's factual findings regarding Jama's mental health were limited. The IJ noted, for instance, that Jama has been diagnosed with depression, anxiety, and PTSD; that he attempted suicide or was hospitalized due to suicidal ideations three times between 2009 and 2015; and that he has a history of alcohol and drug abuse. Citing Matter of G-G-S-, 26 I. & N. Dec. 339 (BIA 2014), however, the IJ did not make a factual finding as to the impact of these mental health issues on the circumstances underlying Jama's assault conviction (and whether they indicate a risk of danger). Cf. Matter of Z-Z-O-, 26 I. & N. Dec. 586, 590 (BIA 2015) (explaining that an IJ's "finding that a future event will occur is a finding of fact that the [BIA] must review under the clearly erroneous standard"). And because the IJ's findings on the factors relevant to the particularly serious crime inquiry did not incorporate evidence of Jama's history of mental illness, it was not within the BIA's province to incorporate that evidence in the first instance. By doing so, the BIA did not merely reweigh the factors—it redefined them. See Flores, 699 F.3d at 1003-04 (explaining that when the IJ makes "no factual findings" on a particular issue, "any potential findings by the BIA [on the same issue] would be the result of an independent, improper factual analysis"); Eweedah v. Barr, 798 F. App'x 172, 174 (9th Cir. 2020) (mem.) (granting petition for review where "IJ did not explicitly weigh" testimony regarding noncitizen's mental health "in concluding that [his] crime was particularly serious," and BIA "should have remanded . . . to the IJ for an initial determination of whether [the] crime was particularly serious considering this

mental health evidence"). For this reason, I would grant the petition for review on Jama's withholding-of-removal claims.[8]

B.

As for Jama's application for deferral of removal under CAT, I believe he met his burden of "establish[ing] that it is more likely than not that he . . . would be tortured if removed" to Somalia, 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a), and that such torture would be inflicted by the Somali government or with its acquiescence, id. § 1208.18(a)(1).

1.

First, the record compels the conclusion that Jama would more likely than not be tortured by chaining if removed to Somalia. For an act to constitute "torture" under CAT, there must be an underlying "intent to cause severe harm, not simply intent to carry out an act that ultimately results in harm." Lasu v. Barr, 970 F.3d 960, 967 (8th Cir. 2020). As discussed further below, the practice of chaining mentally ill persons—with tight, painful metal restraints, often for months or years— remains widespread throughout Somalia. See, e.g., Admin R. at 299-300, 720, 738, 740. The same goes for indefinite detention, seclusion, and forced medication. See, e.g., id. at 301, 338, 379, 425, 906. Importantly, the record shows that "[c]haining

---

[8]The BIA's decision also includes the following statement: "Considering all reliable information, . . . including the respondent's mental health history, upon our de novo review, we conclude that the respondent's crime was a particularly serious one." Absent any discussion of whether the IJ's factual findings regarding Jama's mental health were clearly erroneous, the reference to "de novo" in the same sentence as Jama's mental-health history "raises the question whether the Board confused or mixed the standards of review." Garcia-Mata v. Sessions, 893 F.3d 1107, 1110 (8th Cir. 2018). Though the BIA's impermissible fact-finding is, in my view, apparent from the face of the decision, a petition for review should be granted even where, "[w]ithout more explanation, [the court is] unable to resolve whether the [BIA] conducted impermissible factfinding of its own." Id.

-17-

is . . . commonly used as a form of punishment when patients refuse to follow orders, exhibit aggressive behavior[,] or try to escape," id. at 905, evincing an intent by healthcare practitioners or facility staff to inflict severe harm. This is consistent with the persistent societal belief in Somalia that mental illness is caused by evil and merits punishment. See id. at 295, 741.

With respect to Jama specifically, the record contains expert evidence showing that Jama's mental illnesses manifest in visibly erratic behavior and substance abuse, that being in Somalia would exacerbate his illnesses due to the trauma he experienced there, that his physical impairments limit his ability to work, and that he lacks the necessary support networks within Somalia to access housing, treatment, and medication. See id. at 306, 339-41. As a result, and given the widespread stigma against mental illness in Somalia, Jama would probably be involuntarily institutionalized. See id. at 339-41, 427-29, 807-08. Once institutionalized, the likelihood that he would be chained is anywhere from 75-90%. Id. at 309-10, 428-29, 905. Chaining would also be especially painful to Jama due to a prior ankle injury that makes it difficult for him to walk. Id. at 309. Taking these facts together, it is probable that Jama would be institutionalized and chained if removed to Somalia and that this would constitute torture under CAT.[9]

_____

[9] I also agree with Jama that the likelihood of torture increases even more when considering the risk of chaining together with the risk of harm from al-Shabaab. Though Jama has failed to challenge the IJ's finding on the likelihood of torture by al-Shabaab alone on appeal, he does argue that the risk of harm from al-Shabaab—even if it does not amount to torture in and of itself—adds to "the aggregate risk of torture from all sources," Abdi Omar v. Barr, 962 F.3d 1061, 1065 (8th Cir. 2020) (cleaned up). The record supports this conclusion, too, especially given how conspicuous Jama's mental illness, accent, dress, alcohol use, and U.S. ties would make him to a group like al-Shabaab. See, e.g., Admin R. at 241-46, 340, 459, 1454, 1936, 1956-57; see also In re G-A-, 23 I. & N. Dec. 366, 368-70 (BIA 2002) (granting CAT relief on the basis of evidence that (1) "Armenian Christians are subject to harsh and discriminatory treatment in Iran"; (2) "Iranians who have spent an extensive amount of time in the United States are perceived to be opponents of the Iranian Government or even pro-American spies"; (3) "persons associated with

-18-

2.

Moving to the government acquiescence prong, the fact that the Somali government has been trying to improve Somalia's mental healthcare system does not negate the substantial evidence that officials in public facilities continue to chain mentally ill patients, or that this practice remains pervasive. See, e.g., Admin R. at 339 ("[A]t both public and private mental health facilities in Somalia[,] [p]atients are routinely chained upon admission, and remain chained for months, years, or even indefinitely."); id. at 427 ("In the majority of private centers and in many public facilities chains are widely used . . . ."); id. at 750 (documenting chaining at the public Berbera General Hospital); id. at 754 (noting that most staff members at public and private facilities resort to isolating, chaining, and sedating aggressive patients). The court emphasizes that chaining is more prevalent in private facilities, but this fact actually cuts both ways. Because there are very few mental health practitioners in Somalia overall, it appears that most work in both public and private facilities. See id. at 378, 721, 732, 798. Considering the government's general failure to regulate mental health services together with the high incidence of chaining at private facilities, it seems unlikely that the same workers who perpetrate the practice at one location would decline to do so at another. This inference is consistent with evidence showing that chaining remains widespread in public mental health facilities.

Moreover, though the court highlights the efforts of the Somali government to develop the country's mental health care sector, it fails to adequately interrogate the substance and credibility of those efforts. As late as 2015, the Somali Ministry of Health spent $47,500 to build a new mental health ward in Mogadishu with metal hooks in the ground for chaining patients. Id. at 733. This supports the conclusion that the Somali government would likely condone the chaining of Jama should he

narcotics trafficking face particularly severe punishment"; (4) and "security forces and prison personnel continue to torture detainees and prisoners").

be institutionalized (and the record shows he probably would be). Similarly, the government's plan to improve mental health training at Somali universities does not change the fact that public employees currently do chain mentally ill patients—often and for prolonged periods of time.[10] See, e.g., id. at 905 ("Chaining is also widely practiced within both public and private mental health facilities . . . , commonly used as a form of punishment when patients refuse to follow orders, exhibit aggressive behavior or try to escape."); id. at 341 ("Abdullahi Jama would experience [chaining] at either public or private facilities" because "such treatment is accepted and employed by healthcare workers, including workers employed by the government."). Thus, though the chain-free initiative has been implemented at one facility, the Somali government's nod toward expanding that initiative holds little weight when its employees are simultaneously engaging in the practice and its officials are building new facilities that accommodate it.

Ultimately, "it is not contrary to the purposes of the CAT . . . to hold [Somalia] responsible for the acts of its officials, including low-level ones, even when [they] act in contravention of the nation's will and despite the fact that the actions may take place in circumstances where the officials should be acting on behalf of the state in another, legitimate, way." Ramirez-Peyro v. Holder, 574 F.3d 893, 901 (8th Cir. 2009). Jama does not have to prove the Somali government's participation or acquiescence in his torture with certainty; and on this record, the Somali government is at least more likely than not to do so.[11]

---

[10]There is no evidence that the Somali government has even attempted to prohibit or otherwise penalize the practice of chaining, whether in public or in private institutions. In this context, it matters little that Somalia recently approved its "first mental health policy." Indeed, according to the former Director General of the Ministry of Health, this policy is merely "an aspirational document," Admin R. at 762—and even there it seems deficient. According to Human Rights Watch, the policy does not even call "for the development of clear guidelines and protocols on issues of restraints." Id.

[11]With respect to added risk of harm from al-Shabaab, Jama presented evidence showing that al-Shabaab controls most of south and central Somalia, the routes to and from Mogadishu, and Mogadishu itself at night (with increasing

For the foregoing reasons, I would grant the petition for review.

————————————————

---

daytime attacks).  Admin R. at 1030, 1038, 1052, 1097, 1169.  This suggests government acquiescence or approval wherever al-Shabaab is the de facto government.  See Delgado v. Mukasey, 508 F.3d 702, 709 (2d Cir. 2007) (concluding that BIA erred in rejecting claim of government acquiescence in FARC violence where record showed that FARC controlled a "Switzerland-sized area" of Colombia).