# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1688

_____

Imad Ibrahim Mouawad,      *
     *
      Petitioner,      *
     *
     *    Petition for Review of an Order of the
      v.      *    Board of Immigration Appeals.
     *
Alberto Gonzales, Attorney General      *
of the United States of America,      *
     *
      Respondent.      *

_____

Submitted: November 16, 2006
Filed: March 14, 2007

_____

Before LOKEN, Chief Judge, MELLOY, Circuit Judge, and SCHILTZ, District Judge.[1]

_____

MELLOY, Circuit Judge.

Imad Ibrahim Mouawad, a native and citizen of Lebanon, overstayed his tourist visa to the United States and immigration authorities charged him as a removable alien under 8 U.S.C. § 1227(a)(1)(B). Mouawad subsequently applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("the IJ") denied all three applications, finding that

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

Mouawad's asylum application was untimely and that he did not meet his burden of proving eligibility for withholding of removal or CAT relief. The Board of Immigration Appeals ("the Board") adopted and affirmed the decision of the IJ. Mouawad now petitions this court for review of that decision. We deny the petition in part, grant the petition in part, and remand for further proceedings.

## I. BACKGROUND

Mouawad entered the United States legally on August 24, 2000, with a one-month tourist visa. He overstayed the visa by more than three years. On November 23, 2003, immigration authorities commenced removal proceedings against him by serving him with a notice to appear. At a master calendar hearing in February 2004, Mouawad admitted removability and indicated his intent to file an application for asylum, withholding of removal, and CAT relief. He formally filed that application on March 31, 2004, and the IJ held a final removal hearing the following November.

### A. Factual Background

Mouawad was the sole witness at the hearing, and we recount the substance of his testimony here. Mouawad is a Lebanese Christian who grew up during Lebanon's war-torn 1980s. At a young age, he began working as a furniture craftsman. Mouawad suffered some verbal harassment from the Syrian military and endured recruitment attempts by Muslim militias during that time. According to Mouawad, the militias "need[ed] people" to support them and therefore had no qualms about recruiting Christians to serve their Muslim causes.

Mouawad's substantive claims for relief, however, arise primarily out of events related to his service as a personal aide to a commandant in the Lebanese military from 1995 to 1996. During that time, Mouawad received vague threats from unfamiliar, unarmed civilians he believed were members of Hizballah, a group that

the U.S. State Department has recognized as a foreign terrorist organization. These men wanted Mouawad to join their cause and feed them military information; Mouawad did not comply with their demands. Mouawad had similar contacts with other men on subsequent occasions during his military service, and he believed these men sometimes followed him while he was driving. He told the commandant of this harassment, and the commandant merely warned Mouawad to be careful. The military also undertook an investigation into whether Mouawad was giving information to Hizballah and threatened to punish him by extending his mandatory term of service.

On October 27, 1997—one year after Mouawad's discharge from the military—an unknown person or group murdered Samir Daou, a neighbor and friend of Mouawad who was engaged in some manner of covert employment. Mouawad learned of the murder from watching the local television news in his apartment, which identified Daou as a victim that evening. Mouawad immediately feared that the perpetrators were from Hizballah and that his own life might be at risk. Later that night, he heard loud knocking at his apartment door for half an hour. Through the peephole, he could see there were several men outside. He heard a neighbor question the men about their business there, and they told her they sought Mouawad because they knew he was Daou's friend. They also said they knew Mouawad was present because his car was parked outside the apartment building. Mouawad did not open the door until morning, after the men had left. He slipped out of the apartment building and took refuge in a church for a week.

Mouawad did not return to his apartment, although he continued to drive his same car and maintained his business relationships as a self-employed carpenter. Investigators hired by Daou's family found and interviewed Mouawad within a few weeks after Daou's murder. Mouawad later learned that their investigation pointed to members of Hizballah as the culprits in the killing. Mouawad moved around Lebanon and lived in several different places for the next three years. Mouawad did not testify as to any further harassment during that period. His fears persisted

nevertheless, and he traveled to Syria in April 2000 to obtain a visa for entry into the United States. He spent four months winding up his financial affairs in Lebanon, then traveled to the United States in August of that year. His parents later told him not to return because men had come to their home looking for him.

Mouawad's visa expired in September 2000, but Mouawad overstayed it and has remained in the United States. He paid $1,000 to enter a sham marriage with an American woman shortly after his arrival in this country; she did not file appropriate immigration paperwork for him, and he soon divorced her. He later entered another marriage with a Canadian citizen. She was seeking annulment of that marriage at the time of Mouawad's hearing.

B. The IJ's Decision

The IJ stated that he had "significant concerns" about Mouawad's credibility, though he did not make an explicit finding of adverse credibility.[2] Despite these concerns, the IJ based his decision on grounds other than Mouawad's questionable credibility, and he denied relief to Mouawad on all three of his claims. First, the IJ found that Mouawad's 2004 application for asylum was time-barred under 8 U.S.C. § 1158(a)(2)(B), which sets a one-year filing deadline upon the date of an alien's arrival in the United States. The IJ noted that he may excuse this deadline upon a showing of changed circumstances affecting asylum eligibility or "extraordinary circumstances relating to the delay in filing an application," id. § 1158(a)(2)(D), but found that Mouawad's excuse for his late filing—an inadequate understanding of

---

[2]In the instant appeal, Mouawad argues that the IJ erred in making an adverse credibility finding. The IJ made no such finding explicitly, saying only that he had concerns about Mouawad's credibility. To the extent that such general concerns may be characterized as an adverse credibility finding, that finding would nevertheless be irrelevant to this case because the grounds for the IJ's decision do not depend upon Mouawad's credibility.

English and asylum procedures upon his arrival—failed to qualify as "extraordinary." The IJ also found that explanation in conflict with Mouawad's own admission that he engaged in a sham marriage shortly after entering the country, an act that suggests some knowledge of American immigration law.

Second, the IJ found that Mouawad did not meet the statutory requirements for withholding of removal. The IJ noted that Mouawad had not suffered harm that rose to the level of persecution in Lebanon, but the IJ did not decide the claim on the ground that Mouawad lacked a well-founded fear of future persecution due to his failure to testify as to sufficiently severe abuse in the past. Instead, he denied Mouawad's claim for withholding of removal because Hizballah's purported efforts to coerce Mouawad's cooperation in their cause did not amount to persecution on a protected ground. Third, the IJ denied Mouawad's application for CAT relief on the sole ground that Mouawad's fears related to Hizballah, rather than officials of the Lebanese or Syrian governments. The IJ did grant Mouawad the privilege of voluntary departure from the United States.

Mouawad appealed to the Board, which affirmed and adopted the decision of the IJ without a separate opinion. Mouawad now petitions this court for review of that decision and raises a number of issues, only three of which warrant discussion: (1) that the IJ should have excused the one-year filing deadline for Mouawad's asylum application; (2) that substantial evidence does not support the IJ's denial of Mouawad's application for withholding of removal; and (3) that substantial evidence does not support the IJ's denial of Mouawad's application for CAT relief.

## II. DISCUSSION

### A. Asylum

Mouawad first argues that the IJ should have waived the one-year filing deadline for Mouawad's asylum application. See 8 U.S.C. § 1158(a)(2)(B) (establishing the one-year deadline); id. § 1158(a)(2)(D) (waiving the deadline when the alien can show, "to the satisfaction of the Attorney General[,] . . . changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application"). On appeal, Mouawad contends that he showed both "extraordinary circumstances" (namely his lack of secondary schooling and minimal understanding of the English language upon arriving in the United States) and "changed circumstances" (namely the increase in regional tensions in Lebanon after the 9/11 terrorist attacks). Therefore, he argues that the IJ should have excused his untimely filing and reached the merits of his claim for asylum.

At the threshold, we must determine whether Congress has granted our court jurisdiction to decide this issue. Mouawad concedes that this court lacked jurisdiction to review a determination that an asylum application was untimely prior to the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. See 8 U.S.C. § 1158(a)(3) ("No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)."); Ismailov v. Reno, 263 F.3d 851, 855 (8th Cir. 2001) (finding that this court lacks subject-matter jurisdiction to review a petitioner's claim that the Board erred by failing to find extraordinary circumstances related to his untimely asylum application). Nevertheless, Mouawad argues that the REAL ID Act's affirmation of our jurisdiction to review "constitutional claims or questions of law," REAL ID Act of 2005 § 106(a)(1)(A)(iii), 119 Stat. 231, 310, codified at 8 U.S.C. § 1252(a)(2)(D), narrows the scope of § 1158(a)(3) and enables our court to hear his claim that the IJ erred in finding that Mouawad failed to

demonstrate extraordinary circumstances or changed conditions "to the satisfaction of [the IJ]" within the meaning of 8 U.S.C. § 1158(a)(2)(D).

Mouawad does not raise any colorable constitutional challenges or questions of law as to the IJ's determinations that Mouawad failed to meet the deadline and failed to show sufficient extraordinary or changed circumstances, however.[3] Furthermore, this court has rejected the same argument in other cases subsequent to the passage of the REAL ID Act. See Jallow v. Gonzales, 472 F.3d 569, 571 (8th Cir. 2007); Tolego v. Gonzales, 452 F.3d 763, 766 (8th Cir. 2006); Wijono v. Gonzales, 439 F.3d 868, 871 (8th Cir. 2006); Ignatova v. Gonzales, 430 F.3d 1209, 1213-14 (8th Cir. 2005). Thus, because the IJ determined that the untimeliness of Mouawad's asylum application was not excused by exceptional circumstances or changed conditions within the meaning of 8 U.S.C. § 1158(a)(2)(D), we lack jurisdiction to review Mouawad's asylum claim.

B. Withholding of Removal

There is no similar one-year requirement for applications for withholding of removal, however, and therefore we have jurisdiction to review the IJ's denial of that ground for relief. 8 U.S.C. § 1252(a); see Wijono, 439 F.3d at 872 (reviewing a denial of withholding of removal despite having no jurisdiction to review the denial of asylum relief on the basis of untimeliness). To qualify for withholding of removal, an applicant must show a "clear probability," Zhuang v. Gonzales, 471 F.3d 884, 891

---

[3]Citing law from our sister circuits, Mouawad does make one arguably legal contention with regard to the denial of his asylum claim: that the IJ failed to sufficiently explain or make an individualized assessment of changed conditions with regard to his finding that Mouawad failed to qualify for a waiver of the deadline. This argument lacks merit. Even if we were to find jurisdiction on this issue, we note that the IJ's decision directly addressed the only reasons Mouawad gave him for the late filing, and it provided adequate explanation as to why those reasons were insufficient under the standards of 8 U.S.C. § 1158(a)(2)(D).

(8th Cir. 2006), that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). An applicant may make the requisite showing by one of two means. First, the applicant may show past persecution on the basis of one of the protected grounds listed above, thus creating a rebuttable presumption that his life or freedom would be threatened upon removal. 8 C.F.R. § 1208.16(b)(1). Second, the applicant may qualify for withholding of removal if he or she establishes that "it is more likely than not that he or she would be persecuted" upon removal based upon one of the protected grounds upon removal. 8 C.F.R. § 1208.16(b)(2). We review the denial of an application for withholding of removal for substantial evidence, and will reverse the decision of the IJ only if the record compels the conclusion that Mouawad qualified for withholding of removal. Wijono, 439 F.3d at 872.

We find substantial evidence to support the IJ's decision here, because Mouawad's testimony does not compel the conclusion that any past or feared future persecution at the hands of Hizballah was or would be on account of a protected ground. Mouawad testified to his Maronite Christian beliefs, but nowhere in the record does he suggest that Hizballah harassed him because of those beliefs. See INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992) ("Elias-Zacarias objects that he cannot be expected to provide direct proof his persecutors' motives. We do not require that. But since the statute makes motive critical, he must provide *some* evidence of it, direct or circumstantial."). Indeed, Mouawad testified that his religious beliefs were irrelevant to his alleged persecutors. He claimed that Hizballah members first approached him because they wanted him to provide inside information on the Lebanese military, and that the religion of those from whom they seek support "doesn't matter" to the Muslim militias in Lebanon. Thus, Mouawad failed to establish a clear probability of persecution on the basis of his religion upon his return to Lebanon.

-8-

Similarly, Mouawad did not establish that Hizballah sought (or will seek) him out for persecution on the basis of a political opinion. At oral argument, he contended that his refusal to give military secrets to Hizballah amounted to the assertion of a political opinion of opposition to that group's aims, or at least caused Hizballah to impute that opinion to him. Without other evidence to support that assertion, Mouawad's argument is substantially identical to the argument the Supreme Court heard and rejected in <u>Elias-Zacarias</u>, 502 U.S. at 481-82. We are therefore bound to reject it here.

Substantial evidence supports the IJ's decision to deny Mouawad's application for withholding of removal because Mouawad's testimony would not compel a reasonable factfinder to conclude that any persecution he suffered or may suffer would be on account of a protected ground. Because we find this ground for denial of Mouawad's claim legally sufficient, we need not address the IJ's other stated reasons for the denial.

C. Recent Events in Lebanon

Much of Mouawad's argument with regard to his asylum and withholding of removal claims focuses upon recent events in Lebanon, including the well-publicized armed conflict between Hizballah and Israeli forces during the summer of 2006. Both the IJ and the Board denied Mouawad's claims prior to these events, and therefore any impact they have upon Mouawad's claims is not a proper issue for this court in this appeal. If Mouawad wishes to address these recent events before an adjudicative body, the appropriate course is to bring a motion to reopen before the Board on the basis of changed circumstances in Lebanon. 8 C.F.R. § 1003.2(c)(1), (3)(ii). At oral argument, Mouawad informed this court that he has done so, and that the Board had not yet ruled upon that motion. Thus, given the posture of this case, we do not consider recent events in Lebanon for the purposes of this appeal.

D. Convention Against Torture

To qualify for relief under the CAT, an alien must instead establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). For applicants, this standard for relief is more onerous than the standards for asylum and withholding of removal in certain respects; for example, "persecution" for the purposes of asylum and withholding of removal may encompass abuse that is less severe than "torture" for the purposes of the CAT. See Samedov v. Gonzales, 422 F.3d 704, 708 (8th Cir. 2005) (noting the CAT's "narrow definition" of torture). The standards for CAT relief are less onerous, however, in that they do not require an applicant to show that he fears future harm on the basis of any statutorily-defined ground.

To constitute "torture" under the CAT, the relevant act(s) must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id. § 1208.18(a)(1). For the purposes of the CAT, "acquiescence" exists when "the public official, prior to the activity constituting torture, ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene." 8 C.F.R. § 1208.18(a)(7). This inquiry centers upon the willfulness of a government's non-intervention. A government does not acquiesce in the torture of its citizens merely because it "is aware of torture but powerless to stop it," Ramirez-Peyro v. Gonzales, No. 06-1569, 2007 WL 542235, at *2 (8th Cir. Feb. 23, 2007), but it does cross the line into acquiescence when it shows "willful blindness toward the torture of citizens by third parties." Menjivar v. Gonzales, 416 F.3d 918, 923 (8th Cir. 2005).

As with claims for withholding of removal, we review the factual basis for an IJ's denial of a CAT claim for substantial evidence. Ibrahim v. Gonzales, 434 F.3d 1074, 1078-79 (8th Cir. 2006). "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."

SEC v. Chenery, 318 U.S. 80, 87 (1943). Therefore, if "the IJ's holding is insufficient to allow us to conduct any meaningful review of [his] decision," we must remand the case to the Board for further explanation or reconsideration. Hailemichael v. Gonzales, 454 F.3d 878, 884 (8th Cir. 2006).

Here, the IJ denied Mouawad's CAT claim on the sole ground that he failed to show that any harm he may face would be inflicted by the Lebanese or Syrian governments. The IJ's entire discussion of the CAT claim was as follows:

> Regarding a claim under Article 3 of the Convention Against Torture, the group that respondent stated his primary fear relates to is Hezbollah. He has not indicated any fear of the government of Lebanon. To qualify for relief under the Torture Convention, you must establish that you fear being tortured by or at the instigation of, or with the consent or acquiescence of, a government official. There is really no evidence here that the respondent has any fears relating to the government of Lebanon. Any claims relating to the Syrian authorities are severely undercut by the fact that the respondent has made three trips to Syria, legally crossing the border into that country with his Lebanese passport. In summary, the respondent has not met his burden of proof to establish a basis for a Torture Convention claim.

Substantial evidence certainly supports the IJ's denial of Mouawad's CAT claim insofar as it relates to torture at the hands of the Lebanese or Syrian governments directly. But the IJ's opinion does not address the question of whether Hizballah—the group that Mouawad allegedly fears, and the group whose acts constitute the primary basis for his request for relief—commits such acts with the acquiescence of the Lebanese government. We cannot say that the question of acquiescence was unworthy of discussion. Contrary to the government's assertion in its brief that "there is no evidence that [the alleged harassment] came at the hands of persons that the government of Lebanon was unwilling or unable to control," we find several facts in the record on this issue. At the time of Mouawad's hearing, the most

-11-

recent State Department report on Lebanon noted that the Lebanese government had made no attempt to disarm Hizballah, and a report from the British government stated that a number of Hizballah members had been elected to the Lebanese parliament and that the Lebanese government's control over the group was limited. In addition, Mouawad testified that Lebanon is "completely different than here" in that "the police can't do anything for you" there. As a result, Hizballah was the only group in Lebanon that can "kill and run and nobody will find out how." Mouawad testified that he brought complaints about the threats and harassment by Hizballah to his superior military officer as early as 1995, but the military took no action to protect him. Instead, Mouawad said that officers began questioning him as to whether he was leaking information to Hizballah, and they threatened to detain him beyond his mandatory term of service as a form of punishment.

Despite this evidence, the IJ never explicitly considered whether the Lebanese government acquiesces in Hizballah's acts of violence and intimidation, nor whether there is a sufficient likelihood that Mouawad would be tortured by Hizballah members if returned to Lebanon. The IJ's failure to address these issues leaves us unable to conduct any meaningful review of his decision as it relates to Mouawad's CAT claim.[4]

The government also argues that the facts in Mouawad's case do not suggest that it is more likely than not that he would suffer torture upon his return to Lebanon, regardless of the affiliation of the feared torturers. The government is free to make

---

[4]This is not to say that an IJ must always perform separate analyses of an applicant's claims for asylum, withholding of removal, and relief under the CAT. In many cases, including this one, the alien applies for all three forms of relief and supports that application with the same factual allegations. In such cases, a separate CAT analysis is generally necessarily only when the grounds for denying a claim for asylum or withholding of removal rest upon eligibility requirements that are in addition to, or more stringent than, the eligibility requirements under the CAT. See Samedov, 422 F.3d at 708.

that argument upon remand to the Board. As noted above, however, the IJ's decision did not include such a finding. As such, we decline the government's invitation to violate the principles of <u>Chenery</u>, and we remand the case to the Board for further proceedings.

## III. CONCLUSION

For the foregoing reasons, we hold that we lack jurisdiction to review the IJ's finding that Mouawad's asylum application was untimely. We also deny the petition for review insofar as it relates to his claim for withholding of removal, and we grant the petition for review insofar as it relates to his CAT claim.

———————————————