# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3571
_____

Chuor Chuor Chuor

*Petitioner*

v.

Merrick B. Garland, Attorney General of the United States

*Respondent*
_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Submitted: February 17, 2022
Filed: August 4, 2022
_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.
_____

LOKEN, Circuit Judge.

Petitioner Chuor Chuor Chuor, a native of Egypt and citizen of South Sudan, was admitted to the United States in June 1999 at the age of nine as a derivative asylee of his father, Chuor T. Chuor, who was previously granted asylum. After some twenty arrests, and convictions for theft, fifth-degree assault, disorderly conduct, driving under the influence, and domestic violence against his ex-wife, the Department of Homeland Security (DHS) commenced removal proceedings. Chuor

conceded removability and applied for adjustment of status and waiver of inadmissibility, asylum, withholding of removal, and deferral of removal under the Convention Against Torture (CAT).

After a hearing at which Chuor and his father testified, the Immigration Judge (IJ) denied Chuor adjustment of status and waiver of inadmissibility, finding that his extensive criminal history since arriving in the United States made him a "violent and dangerous" individual, and that his Minnesota domestic assault conviction was an aggravated felony "crime of violence." 8 U.S.C. §§ 1159(a), (c), 1182(a)(2)(A)(i)(I). The IJ further ruled that this conviction made Chuor statutorily ineligible for asylum and withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). On appeal, the Board of Immigration Appeals (BIA) upheld these rulings.

The IJ also granted Chuor deferral of removal under the CAT, finding that he "will more likely than not be identified by the government of South Sudan upon arrival and will be targeted for detention, torture, and death because of his relationship to his father" and "his father's status as a political traitor." The DHS cross-appealed this decision. Applying the clearly erroneous standard of review, the BIA reversed the IJ and denied Chuor CAT relief, concluding that the IJ's finding was clearly erroneous because Chuor "presented insufficient evidence to establish that he faces a personal risk of torture." The BIA ordered Chuor removed to South Sudan. Chuor petitions for judicial review of the BIA's decision, limiting the petition to the denial of CAT relief. We deny the petition for review.

## I. Background

At Chuor's removal hearing, Chuor and his father testified about their time in Sudan in the 1990s, which was then a unified country engaged in a civil war between the north and south. Chuor's father represented the southern region in the Sudanese parliament in 1995 and 1996, and the family moved from the south to the Sudanese

capital, Khartoum. While serving in parliament, Chuor's father came under attack from both sides. The north believed he was a spy from the south, while the south saw his service in the Sudanese government as a betrayal. Though never harmed, he was constantly surveilled and often threatened by northern officials. Chuor's father fled Sudan and entered the United States in August 1996, where he was granted asylum. The rest of the family remained in Khartoum for over a year. Government officials often came to their home to ask about Chuor's father, and physically assaulted Chuor's mother when she did not provide information. The family fled to Egypt in November 1997 and came to the United States in 1999. No member of the family has returned to Sudan. The IJ found the testimony of both Chuor and his father credible.

South Sudan became an independent country in 2011. Though its government is not the Sudanese government Chuor's father served, the party currently in power in South Sudan, the Sudanese People's Liberation Movement, is the same group that led the south during the civil war. Chuor's father has been vocal in his opposition to the current government, and he believes the government of South Sudan still considers him a traitor. Chuor's father testified that if Chuor returned to South Sudan, the government would recognize Chuor because of their shared name and would kill him. Chuor echoed this sentiment and also claimed that he fears returning to South Sudan because of its treatment of the mentally ill. Chuor has been diagnosed with PTSD, depression, ADHD, and anxiety.

In addition to this testimony, Chuor submitted community letters in support of his applications, including one from Juma Artema, Chairman of the South Sudanese Community Association of Minnesota (the "Artema letter"). Artema wrote that Chuor's father has written and spoken out many times condemning the current conflicts in South Sudan, and that the current president sees him as a traitor. Chuor also submitted country condition reports describing abuse and killings of political opponents by the government in South Sudan and the mistreatment of the mentally ill in South Sudan prisons.

-3-

In a lengthy analysis, the IJ found it more likely than not, because "the same parties are still around," that South Sudan government officials will identify Chuor on his arrival, impute his father's status as political traitor to Chuor, and target him for torture or killing for that reason. The IJ found that country conditions evidence showing that "government forces routinely target people for detention, torture, and unlawful killing in South Sudan, based on their perceived political affiliation," strongly supports Chuor's claims. The IJ also considered "the evidence of gross, flagrant, and mass violations of human rights in South Sudan" noted in Department of State reports, and evidence that persons determined to be mentally ill are incarcerated with only "rudimentary" medical care. The IJ found that Chuor could not internally relocate because "[t]he government significantly restricts freedom of movement in South Sudan, and it routinely blocks travel for political figures within and outside the country."

## II. Discussion

**A. The Standard of Review.** To warrant CAT relief, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). This determination is a question of fact. Lasu v. Barr, 970 F.3d 960, 966 (8th Cir. 2020). When the BIA denies CAT relief on this ground and the alien petitions for judicial review, we review the BIA's determination and any IJ findings adopted by the BIA under the highly deferential substantial evidence standard of review. Id.; see Deng Chol v. Garland, 25 F.4th 1063, 1067 (8th Cir. 2022); cf. Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020). The BIA's decision is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

When the IJ has granted CAT relief on this ground, and the BIA vacates that ruling, our standard of review is more complicated. The Attorney General's regulations defining the BIA's jurisdiction and powers expressly provide:

(3) *Scope of review.* (i) The Board will not engage in *de novo* review of findings of fact determined by an immigration judge. Facts determined by the immigration judge . . . shall be reviewed only to the determine whether the findings . . . are clearly erroneous.

8 C.F.R. § 1003.1(d)(3)(i). When a petitioner seeking review of the denial of CAT relief argues that the BIA failed to properly apply this clear error standard of review, he presents a question of law that we review *de novo* to determine whether the BIA "refrained from independent factfinding," as its regulations require. Abdi Omar v. Barr, 962 F.3d 1061, 1064 (8th Cir. 2020). However, if the BIA has declared at the outset, as in this case, that it applied the clear error standard in determining that the IJ erred in finding likelihood of torture, "*de novo* review does not mean that we can redetermine *de novo* whether we think the IJ has committed clear error." Wu Lin v. Lynch, 813 F.3d 122, 129 (2d Cir. 2016). Rather,

we consider whether the Board provided sufficient justification for its determination. This means that the Board must adequately explain why it rejected the IJ's finding and identify reasons grounded in the record that are sufficient to satisfy a reasonable mind that there was clear error.

Abdi Omar, 962 F.3d at 1064, citing Wu Lin, 813 F.3d at 129; accord Mohamed v. Garland, 9 F.4th 638, 640 (8th Cir. 2021). "The regulation was not intended to restrict the BIA's powers to review, including its power to weigh and evaluate evidence introduced before the IJ." Robles v. Barr, 940 F.3d 420, 422 (8th Cir. 2019) (quotation omitted), cert. denied sub nom. Robles v. Rosen, 141 S. Ct. 1047 (2021).

**B. Analysis.** Chuor's Opening Brief argues the BIA failed to review the IJ's findings for clear error, improperly replacing them with the BIA's own findings, in conducting *its* review of the IJ's likelihood-of-torture findings. The Reply Brief properly cites Abdi Omar's "adequately explain" standard that governs our review of this issue of law. In support, Chuor further argues that the BIA failed to consider the

-5-

risks of torture he will face in the aggregate and erred in finding the absence of a specific threat dispositive, relying primarily on evidence the IJ relied on to support its contrary likelihood finding.

We conclude that the BIA adequately explained why it rejected the IJ's likelihood-of-torture finding and identified reasons grounded in the record sufficient to support this clear error determination. The BIA explained why the IJ's findings failed to establish Chuor was at personal risk of being tortured in South Sudan: the vague and conclusory statements of Chuor's witnesses did not establish the likelihood of personal risk; Chuor's father has had no contact with the country since the 1990s; his father did not identify specific or current threats; the Artema letter lacked detail and identified no one in the South Sudan government with firsthand knowledge of how the father is viewed; the country conditions evidence, while reflecting abuse of the government's political opponents, "does not provide grounds on which to conclude that [Chuor] will be targeted for such abuse"; and the mental health detention he fears if a judge determines he is dangerous "is not torturous conduct." The BIA concluded that the IJ "impermissibly strung together a series of suppositions related to activities of [Chuor's] father, and how they might be revealed to and interpreted by unknown individuals within the government of South Sudan." This explanation is consistent with our prior decisions rejecting claims of improper BIA factfinding. See, e.g., Mohamed, 9 F.4th at 641-42; Abdi Omar, 962 F.3d at 1064-65.

In Jima v. Barr, 942 F.3d 468 (8th Cir. 2019), for example, we upheld the BIA's denial of CAT relief to a citizen of South Sudan who likewise was removable after committing a crime of violence in this country. As in Jima, neither the testimony of Chuor and his father, nor the Artema letter, nor the country reports detailing human rights abuses against identified political opponents, show that "specific grounds exist that indicate [Chuor] would be personally at risk" of torture upon his return to South Sudan. Id. at 473-74 (quotation omitted).

-6-

Chuor argues the BIA failed to consider the risk of torture in the aggregate, instead focusing on isolated and incomplete portions of the evidence. See Abdi Omar, 962 F.3d at 1065 (CAT claims "must be considered in terms of the aggregate risk of torture from all sources"). Specifically, Chuor contends that the BIA should have addressed his father's testimony that the ruling party in South Sudan remains the same as before independence, considers him a traitor, and will target his son for harm; the abuse of his mother in Sudan after his father left in 1996; and each specific finding the IJ made to support its likelihood-of-torture finding.

The BIA expressly stated that the IJ's ultimate finding of likelihood of torture "is not supported by the record." Although it did not individually address all evidence in the record or every IJ finding, its opinion demonstrates that it considered the record as a whole and "accounted for all of the asserted risks in concluding that the immigration judge clearly erred." Abdi Omar, 962 F.3d at 1065; see Jama v. Wilkinson, 990 F.3d 1109, 1120 (8th Cir. 2021), cert. denied sub nom. Jama v. Garland, 142 S. Ct. 773 (2022). "[O]ur precedent does not require a separate or lengthy aggregation analysis." Hassan v. Rosen, 985 F.3d 587, 591 (8th Cir. 2021).

Chuor further argues the BIA "applied the wrong legal standard" when it treated the lack of a specific or current threat against him as dispositive. That is a strained reading of the BIA's opinion, which properly cited the lack of a current or specific threat as one factor in explaining why the record does not demonstrate a personal risk of torture should Chuor be removed to South Sudan. Personal risk of torture is a required element for CAT relief. See Jima, 942 F.3d at 473. The BIA "must consider

all evidence relevant to the likelihood of future torture," including recent threats. Malonga v. Mukasey, 546 F.3d 546, 555-56 (8th Cir. 2008).

For these reasons, we conclude the BIA did not err in concluding that the IJ's likelihood-of-torture finding is clearly erroneous because Chuor presented insufficient evidence to establish that he faces a personal risk of torture in South Sudan. Accordingly, we deny the petition for review.

_____