# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-3349

_____

Eva Maria Becerril-Sanchez

*Petitioner*

v.

Pamela Bondi,[1] Attorney General of the United States

*Respondent*

_____

No. 23-3350

_____

Yamile Garduno-Becerril

*Petitioner*

v.

Pamela Bondi, Attorney General of the United States

*Respondent*

_____

---

[1]Attorney General Bondi is automatically substituted for her predecessor under Federal Rule of Appellate Procedure 43(c)(2).

Petition for Review of an Order of the
Board of Immigration Appeals
_____

Submitted: September 24, 2024
Filed: February 6, 2025
[Published]
_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.
_____

PER CURIAM.

Eva Becerril-Sanchez (Becerril) and her daughter Yamile Garduno-Becerril (Garduno) (collectively, "petitioners") seek review of the Board of Immigration Appeals's (Board) dismissal of their appeals from the immigration judge's (IJ) decisions denying their respective applications for withholding of removal and protection under the Convention Against Torture (CAT), as well as Garduno's application for asylum. Additionally, they challenge the Board's denial of their motion to reopen based on changed country conditions. For the reasons discussed below, we deny the consolidated petition for review.

I. *Background*

The petitioners are natives and citizens of Mexico who entered the United States near Eagle Pass, Texas, in July 2016. The Department of Homeland Security (DHS) determined that it had previously removed Becerril and issued her a Notice of Intent to Reinstate Prior Removal Order. An immigration officer conducted a reasonable-fear interview and found Becerril to possess a reasonable fear of persecution or torture in Mexico; the officer referred Becerril to the IJ for withholding-only proceedings. Meanwhile, DHS issued Becerril's daughter, Garduno, with a Notice to Appear, charging her with removability as a noncitizen present in the

-2-

United States who has not been admitted or paroled. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). Garduno admitted the allegations and conceded the charge of removability in the notice.

The petitioners applied for withholding of removal and CAT protection. Garduno also applied for asylum.[2] The petitioners testified in support of their applications at a merits hearing before the IJ. Becerril testified that she originally left her hometown of Santa Cruz Tepexpan in the Mexican state of Mexico in 2005 to escape mistreatment by her cousin Juan Pablo, an alleged drug trafficker. According to Becerril, Juan Pablo was "a member of the cartels in Mexico" or "the boss of the cartels." A.R. at 332–33, 334.[3] Juan Pablo lived approximately a half mile away from Becerril. She testified that one night in 2002, Juan Pablo came to her house while being chased by rivals. He asked Becerril if he could stay at her home. Becerril, who was seven months pregnant with Garduno, refused his request. She explained to Juan Pablo that her mother and nephews were in the house, and she feared his rivals would kill her family if she allowed him inside. According to Becerril, when she refused to let Juan Pablo inside, he "beat [her], and before beating [her], he threatened [her] life." *Id.* at 333. Juan Pablo hit Becerril "four or five times." *Id.* at 344. He hit her in the face and body. He "pushed [her], and then, while [she] was down, he . . . kicked [her] about once or twice." *Id.* As a result of the attack, Becerril sustained bruises and scarring to her face. Becerril testified that she did not seek medical treatment because

---

[2]"While reinstatement of a prior order of removal prevents an alien from seeking 'relief,' such as asylum, *see* 8 U.S.C. § 1231(a)(5), withholding of removal and protection under CAT are considered 'protection,' not relief, and are thus not barred." *Mendez-Gomez v. Barr*, 928 F.3d 728, 733 n.2 (8th Cir. 2019) (citing Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999) (background information to interim rule)). Accordingly, Becerril is ineligible for asylum but eligible to apply for withholding of removal and CAT protection.

[3]Becerril did not know to which cartel Juan Pablo belonged.

her town did not have any hospital or medical center, though nearby cities did. Following the attack, Juan Pablo ran into the cornfields.

Becerril recounts that the next day, she went with her parents to report the incident to the police; the police refused to make a report because they feared Juan Pablo. Eight days after the attack, the police visited Becerril's home and advised her not to "file a report or talk about the case because" she would "have many more problems" if she did. *Id.* at 336. Becerril believed that Juan Pablo's relationship with the police in her town was "[v]ery close." *Id.* at 339. Becerril acknowledged that Juan Pablo had previously been prosecuted and sentenced to prison; however, she claimed that he committed crimes with impunity. According to Becerril, "many people in [her] hometown talk about" Juan Pablo "kill[ing] [a] 13- or 14-year old boy only because the boy's father had problems with [Juan Pablo]." *Id.* at 341. Becerril maintained that Juan Pablo "came to the United States" for a "short time" to "escape from . . . the boy's father," but he never faced "any consequences for his evil doings." *Id.*

Prior to the incident with Juan Pablo, Becerril worked as a teacher. After the incident, she lost her job. She believed that it was because Juan Pablo's mother (her aunt) "was the director of public education" in the area. *Id.* at 337. Becerril conceded that she had no direct evidence that her aunt was involved in her termination.

Following Juan Pablo's attack, Becerril saw him "many times. . . . [O]ne time, he chased [her] in his car. [She] was in [her] car with [her] mother, and he was chasing [her] with a gun." *Id.* at 338. According to Becerril, Juan Pablo was shouting "obscenities" and "honking" his horn. *Id.* The "obscenities" that Juan Pablo shouted included "f***king b***h, you're going to pay for this. I'm going to kill you. I'm going to chase you. I'm going to kill you, b***h." *Id.* at 339. Becerril claimed that, over a three-year period, she was harassed "about three times a week." *Id.* at 345. Becerril testified that "there were . . . a lot of threats with *their* guns, saying you can't go to the police. *We're* not going to stop bothering you. You can't say that. You need

to go away." *Id.* at 345–46 (emphases added). She claimed that "they" told her that she had to "pay[] for what [she] had done to [Juan Pablo] because he had been hurt" by his rivals after she refused him entry into her house. *Id.* at 346.

Becerril confirmed that she remained in Mexico for another three years after Juan Pablo's assault with no further incident. According to Becerril, she left Mexico in 2005 to escape Juan Pablo; however, she returned to Mexico on July 1, 2016, based on her belief that her daughter Garduno "was in danger." *Id.* at 347. According to Becerril, Juan Pablo again asked to enter Becerril's house, but her brother refused him entry. Juan Pablo again claimed that "he was being chased by these people that wanted to kill him." *Id.* at 348. Becerril testified that Juan Pablo then began threatening Garduno and Becerril's other relatives by "walking by or past them, showing them [his] gun, and making verbal threats to . . . the children or to them." *Id.* at 349. Becerril also claimed that Juan Pablo hit two of her nephews. Becerril and Garduno unsuccessfully attempted to reenter the United States on July 3, 2016.

At the hearing, Becerril conceded that no one "ever threaten[ed] [her] or harm[ed] [her] when [she] w[as] back in Mexico in 2016." *Id.* When asked whether she "ever tr[ied] to move anywhere else inside of Mexico to avoid [her] problems with Juan Pablo," Becerril replied, "I didn't try, but I thought about it many times, but I know that organized crime has roots everywhere. I did not feel safe anywhere, and I just felt that it was a better option, was the distance between Mexico and the United States, and I felt more protected." *Id.* at 349–50.

Becerril's daughter Garduno, who was 13 years old at the time of the hearing, also testified. After Becerril entered the United States, Garduno remained with family members in Mexico. Garduno's "earliest recollection of threatening behavior by Juan Pablo perpetrated against [her]" was when Garduno and her cousins were at a playground. *Id.* at 356–57. Juan Pablo walked around the playground, stopped, and then "pointed with his finger showing that he was following" Garduno, her cousins,

and some friends. *Id.* at 357. According to Garduno, she also saw Juan Pablo "[t]wo, three times per week or once a week" outside of her school. *Id.* On one occasion at the school, Juan Pablo was outside of his vehicle, while Garduno "was with [her] uncle and [her] cousin, and [Juan Pablo] lift[ed] up his t-shirt, and he showed . . . a gun." *Id*. at 358.

Garduno testified that she believed that Juan Pablo was there to watch her and her cousins "[b]ecause he only has problems with us"; however, she admitted that he never spoke to her personally. *Id.* Garduno testified that she "felt unprotected because [her] uncle and aunt . . . were more interested in [protecting] [her] cousin." *Id.* at 359–60. She testified that she and her cousins could not "celebrate birthdays" outside because Juan Pablo was their neighbor, so she mostly stayed in the house. *Id.* at 360. Garduno explained that Becerril returned to Mexico in July 2016 to pick up Garduno, then age 12, after Garduno called Becerril and told her about Juan Pablo's threats against their family. Garduno testified that, besides her aunt and uncle, her grandfather also still lived in Mexico.

In support of their claim, the petitioners submitted documentary evidence. This evidence included declarations by Becerril, a police officer, and Becerril's brother, which confirmed the details of Juan Pablo's criminal record. His criminal record included incarceration and prosecution for murder, robbery, assault, and drug possession, and episodes of criminal behavior and threats. Additionally, the petitioners provided copies of text messages from Juan Pablo to Becerril's brother. In those messages, Juan Pablo threatened that he was "armed," that his "enemies and the cops fear[ed] [him]," that he would "kill" Becerril's brother, and that Becerril's brother would not "go alone" because Juan Pablo was "going to do as many as possible." *Id.* at 381 (bold omitted). Finally, the petitioner submitted several news articles generally reporting on corruption and criminal activity in Mexico, including kidnapping and crimes against women.

## A. *IJ's Decision*

The IJ found Garduno removable as charged and denied both the petitioners' application for asylum, withholding of removal, and CAT protection.

## 1. *Asylum and Withholding of Removal*

First, the IJ found that Becerril failed to establish that she suffered past persecution. The IJ acknowledged that Becerril "suffered bruising and lacerations during [Juan Pablo's] attack" and that Juan Pablo's "beating [of Becerril] certainly frightened" Becerril. *Id.* at 276. But the IJ determined that the attack did not constitute persecution because it "was a minor beating." *Id.* The IJ further stated that "Juan Pablo's continuing harassment and threats," including allegedly threatening her once in a car chase, bribing police officers to threaten her, and causing his mother to fire her from her job, did not rise to the level of past persecution because his threats "appeared vague, non-specific, and lacking in immediacy." *Id.* at 276–77. The IJ noted that Becerril "remained in Mexico without physical harm for several years despite the threats" and Juan Pablo "liv[ing] next door" to her. *Id.* at 277. The IJ reasoned, "If [Juan Pablo] had truly wanted to harm or kill [Becerril], he could have attacked her any time in her house." *Id.* The IJ recognized Garduno's testimony that Juan Pablo harassed and indirectly threatened her over several years but found that Juan Pablo never threatened her in person and had never even spoken with her. The IJ concluded that "the threats were exaggerated and lacking immediacy," given that "Juan Pablo never attempted to fulfill [his] vague threats" and "never physically harmed [Garduno]." *Id.* at 301–02.

The IJ also found that the petitioners failed to establish a reasonable fear of future persecution in Mexico. The IJ noted that several of their relatives remained safe in Mexico. The IJ acknowledged that the record included "some information showing that Juan Pablo has threatened and harassed [Becerril's] brother and his children as well as [Garduno]"; however, the IJ found "nothing in the record show[ing] that he has physically attacked" and no evidence existed "that Juan Pablo

has harmed any of [Becerril's] other relatives in Mexico." *Id.* at 297. Additionally, the IJ found that "the record fail[ed] to support a finding that Juan Pablo . . . targeted the family as a whole"; instead, "the record demonstrate[d] that Juan Pablo . . . threatened and harassed [Becerril] and her brother after they both refused to hide him from a rival drug cartel." *Id*. "Most importantly," the IJ found no evidence "showing that Juan Pablo would travel outside of [Becerril's] hometown to search for her." *Id.* at 298. In fact, the IJ noted, the dispute with "Juan Pablo occurred exclusively in [Becerril's] hometown. She never tried to relocate somewhere else in Mexico to avoid him." *Id.* The IJ rejected Becerril's contention "that Juan Pablo could use his connections in the cartel to find her [because] she could not name his cartel." *Id.* The IJ also noted Becerril's failure to "prove[] that Juan Pablo [was] a 'boss' in the cartel, or . . . could leverage his supposed connections in the cartel to find her nationwide in Mexico." *Id.* The IJ further found that "family membership" was not a cognizable particular social group. *Id.*

## 2. *CAT Relief*

Second, the IJ denied the petitioners' applications for CAT protection because they failed to establish they would likely be tortured if removed to Mexico. The IJ concluded that the petitioners "did not suffer past persecution, much less torture in Mexico." *Id.* at 300; *see also id.* at 303 ("Because the [c]ourt has already denied [Becerril's] claim to CAT protection based upon the same facts, it also denies [Garduno's] application following the same reasoning."). The petitioners were "never arrested or harmed by police, military, or governmental officials in [Mexico]." *Id.* at 300. The IJ acknowledged that Becerril experienced a physical assault but also noted it was a "single beating that she endured in 2002" that did not amount to torture. *Id.* And the IJ cited record evidence that the petitioners "could relocate to another area in Mexico to avoid Juan Pablo," given that their problems occurred exclusively in Becerril's hometown, and Becerril never attempted to move with her daughter to another part of Mexico to avoid them. *Id.* The IJ stated that the record failed to support the petitioners' assumption that Juan Pablo could find them nationwide.

Finally, the IJ stated that the petitioners failed to establish a particularized risk of torture based on general country conditions.

## B. *Board*
### 1. *Initial Decision*

The petitioners appealed to the Board. The Board affirmed the IJ's decision and dismissed the petitioners' administrative appeal. As relevant here, the Board affirmed the IJ's denial of asylum and withholding of removal based on the petitioners' concession that their proposed family-based particular social group was not cognizable under *Matter of L-E-A- (L-E-A- II)*, 27 I. & N. Dec. 581 (A.G. 2019). The Board addressed only the petitioners' request for CAT relief. It determined that the IJ committed no legal or factual errors in denying CAT relief and dismissed the appeal.

The petitioners timely petitioned for review in this court. *See Becerril-Sanchez v. Barr*, Case Nos. 20-3146, 20-3147 (8th Cir.). In light of the Attorney General's intervening decision in *Matter of L-E-A-* (*L-E-A- III*), 28 I. & N. Dec. 304 (A.G. 2021), which overruled *L-E-A- II*, DHS filed an unopposed motion to remand for the Board to reconsider the petitioners' proposed family-based particular social group and the IJ's alternative findings. This court granted the motion. *See Becerril-Sanchez v. Barr*, Case Nos. 20-3146, 20-3147 (8th Cir. July 8, 2021).

### 2. *Decision After Remand*
#### a. *Asylum and Withholding of Removal*

On remand, the Board issued two separate decisions concerning Becerril and Garduno. With respect to Becerril, the Board affirmed the IJ's findings that she did not suffer harms sufficiently severe to constitute persecution. The Board noted that Juan Pablo did once physically assault Becerril when she was pregnant in 2002, resulting in bruising, scratches, and facial scars. Becerril, however, never sought medical treatment for any of her injuries. The Board acknowledged Juan Pablo's

continued harassment of Becerril after the assault but "agree[d] with the [IJ] that the threats [Becerril] experienced were vague, non-specific, and lacking sufficient immediacy to constitute past persecution, considering that Juan Pablo did not inflict further physical harm on [Becerril] despite living a half-mile away from her from 2002 to 2005." A.R. at 4. As to Garduno, the Board likewise rejected her claim of past persecution. According to the Board, "[t]he record support[ed] the [IJ's] determination that although Juan Pablo harassed and indirectly threatened [Garduno] by making threatening gestures at her from a distance, he never threatened her in person or even spoke with her." Pet'rs' Addendum at A7 (citations omitted).

The Board found that the petitioners lacked any objectively reasonable fear of future persecution because Juan Pablo was now dead. Additionally, the Board noted several of their relatives remained in Mexico and were never harmed; furthermore, the petitioners failed to show that they could not relocate within Mexico. The Board affirmed the IJ's denial of CAT protection for the reasons stated in its prior opinion.

### b. *Motion to Reopen*

While their initial petition for review was pending, the petitioners moved to reopen their removal proceedings based on changed country conditions. The petitioners stated that Juan Pablo had "been murdered by other gang members." A.R. at 107. According to the petitioners, "[a]lthough [their] case was principally based upon [Juan Pablo's] threats, [they] [had] always maintained that the local police in the area worked in tandem with local cartels." *Id.* They alleged that, "[s]ince the murder of . . . Juan Pablo, narco-trafficker activity ha[d] only increased and there [was] a rash of kidnapping of females in the area." *Id.* Specifically, Becerril argued that "the recent increase of kidnappings and violence in her native Mexico state, coupled with the fact that she [had] a young daughter and that police corruption [had] remained a constant in Mexico, warrant[ed] a reconsideration of the facts through testimony to be again presented to the I.J." *Id.* The petitioners asked the Board to reopen to consider these new claims based on their female gender. In support of their

-10-

motion, the petitioners attached a new declaration by Becerril explaining her fear of crime, an affidavit from Becerril's sister in Mexico describing their "community to be at high risk" to "young people and girls from [the] community," *id.* at 128, and four news articles describing violence and police corruption in Mexico state.

The Board denied the motion to reopen. It "conclude[d] that the evidence submitted in support of the motion to reopen demonstrates that Mexico has ongoing problems with violence and kidnappings, which do not qualify as a material change in country conditions that would warrant reopening." *Id.* at 85; *see also* Pet'rs' Addendum at A9. The Board also found that the petitioners' motion to reopen did not establish Becerril's or Garduno's prima facie eligibility for asylum, withholding of removal, or CAT protection. The Board determined that, to the extent the petitioners feared generalized crime in Mexico, this did not provide a basis for obtaining asylum or withholding of removal. The Board concluded that neither petitioner had shown specific grounds that she would personally be at risk of torture in Mexico.

## II. *Discussion*

In this consolidated petition for review, the petitioners argue that the Board erred in affirming the IJ's denial of their applications for withholding of removal and CAT protection, as well as Garduno's asylum application.

We apply the substantial evidence standard of review to "decisions on asylum, withholding of removal, and CAT protection." *Calvo-Tino v. Garland*, 107 F.4th 861, 865 (8th Cir. 2024) (internal quotation marks omitted). We will uphold these decisions if they are "supported by reasonable, substantial, and probative evidence based on the record as a whole." *Id.* (internal quotation marks omitted). This court "appl[ies] the substantial evidence standard to both the Board's factual findings and its ultimate conclusion that a petitioner failed to prove past persecution or a well-founded fear of future persecution." *Id.* (internal quotation marks omitted). Legal determinations are reviewed de novo. *Id.* "Only the Board's order is subject to our

-11-

review, including the [IJ's] findings and reasoning to the extent they were expressly adopted by the Board. We view the administrative factual findings as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (cleaned up).

A. *Withholding of Removal and Asylum*

The petitioners argue that the Board legally and factually erred in denying their applications for withholding of removal and Garduno's asylum application. They maintain that they are members of a particular social group—their family. According to the petitioners, even though this court remanded to the Board for consideration of their family-based social group, the Board failed to address that issue; instead, it denied all applications based on its finding that the petitioners did not suffer past persecution. Alternatively, they argue that even if they did not suffer past persecution, they demonstrated a clear probability of future prosecution based on their membership in their family.

A petitioner is eligible for asylum "if the Attorney General 'determines that such [petitioner] is a refugee within the meaning of section 1101(a)(42)(A) of this title.'" *Id.* (alteration in original) (emphasis omitted) (quoting 8 U.S.C. § 1158(b)(1)(A)). Included within the definition of "refugee" is "any person who is 'unable or unwilling to return to [her country of origin] because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group[.]'" *Id.* (alterations in original) (quoting 8 U.S.C. § 1101(a)(42)(A)). "An asylum applicant is entitled to a rebuttable presumption of a well-founded fear of persecution after demonstrating that the applicant's past persecution or harm occurred because of a statutorily protected ground." *Mejia-Lopez v. Barr*, 944 F.3d 764, 768 (8th Cir. 2019).

A petitioner is eligible for withholding of removal if she "show[s] 'a clear probability that [her] life or freedom would be threatened on the basis of [her

membership in a particular social group] if removed to [her country of origin.]'"
*Calvo-Tino*, 107 F.4th at 865 (second, third, and fourth alterations in original)
(quoting *Cano v. Barr*, 956 F.3d 1034, 1038 (8th Cir. 2020)). "The standard for
withholding of removal is a clear probability of persecution, which is more rigorous
than the well-founded fear standard for asylum. Therefore, an alien who cannot meet
the standard for asylum cannot meet the standard for establishing withholding of
removal." *Guled v. Mukasey*, 515 F.3d 872, 881 (8th Cir. 2008) (citations omitted).

> Persecution is an extreme concept that does not encompass
> low-level intimidation and harassment. Minor beatings do not amount
> to political persecution, even if government officials are motivated by
> political animus. A specific threat of imminent death constitutes
> persecution; a threat that is exaggerated, non-specific, or lacking in
> immediacy does not.
>
> . . .
>
> Even if an applicant fails to show past persecution, he may be
> granted asylum if he demonstrates a well founded fear of future
> persecution. A refugee's well-founded fear must be subjectively genuine
> and objectively reasonable. . . . [T]o prove the objective element, [a
> refugee] must provide credible, direct, and specific evidence of facts that
> show a reasonable person in the alien's position would fear persecution
> if returned to his native country. An applicant does not have a
> well-founded fear of persecution if he could avoid persecution by
> relocating to another part of the applicant's country and relocation
> would be reasonable.

*Molina-Cabrera v. Sessions*, 905 F.3d 1103, 1105 (8th Cir. 2018) (cleaned up).

In *Molina-Cabrera*, we held that an asylum applicant failed to establish past
persecution because the harm that the applicant "suffered was not severe enough to
constitute past persecution." *Id.* Specifically, we concluded that the alien did not

-13-

suffer past persecution when, during a 25 to 30 minute meeting with a local politician, the politician pushed the alien to the ground and kicked him for 5 to 10 minutes after the alien declined to join the political party, resulting in only "minor physical injuries [to the alien] from the [single] beating." *Id.* at 1105. Additionally, the asylum applicant failed to prove a well-founded fear of future persecution because the asylum applicant "could avoid possible future persecution by relocating to another part of [the country]." *Id.* at 1106.

The present case is substantially like *Molina-Cabrera* regarding Becerril's claimed past persecution as both cases involved single assaults. Although Becerril was pregnant with her daughter Garduno at the time, no harm came to Garduno in utero.

Becerril also testified that Juan Pablo once chased her in a car while armed with a gun and honked his horn and shouted obscenities at her. Becerril claimed that she was harassed about three times per week after the initial incident, threatened with guns, and told not to go to the police. She claimed that "they" told her she had to pay for what she had done to Juan Pablo because he had been hurt by his rivals after she refused him entry into her house. A.R. at 346. These threats, however, are insufficient to show past persecution. *See, e.g.*, *Padilla-Franco v. Garland*, 999 F.3d 604, 608 (8th Cir. 2021) ("[T]hreats alone constitute persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm." (internal quotation marks omitted)).

For similar reasons, Garduno's claim of past persecution likewise fails. First, as discussed *supra*, Garduno was not harmed in utero. Second, Garduno testified that Juan Pablo never directly threatened her in person and had never even spoken with her. Instead, he had threatened her indirectly by pointing a finger at her and her cousins while they played at a playground and, on another occasion, by lifting his shirt and showing her and her uncle and cousin a gun. These threats were not "so

menacing as to cause significant actual suffering or harm." *Padilla-Franco*, 999 F.3d at 608 (internal quotation marks omitted).

Substantial evidence also supports the Board's finding that the petitioners had no well-founded fear of future persecution. There is no dispute that Juan Pablo is dead; he poses no threat to the petitioners. Additionally, the petitioners could relocate within their country. *See Molina-Cabrera*, 905 F.3d at 1106. Becerril testified that she had not even *tried* to relocate to avoid her problems with Juan Pablo. She did not even know which cartel he belonged to or where in the country cartel members had influence.

Because Garduno's asylum claim fails, her withholding-of-removal claim necessarily fails. And, for the reasons explained, Becerril has failed to show a clear probability of persecution, meaning her withholding-of-removal claim likewise fails.

B. *CAT Protection*

The petitioners next argue that they are entitled to CAT protection because of "the past harm and threats they and their family suffered, as well as the country conditions reports of record." Pet'rs' Br. at 14.

An applicant seeking CAT protection must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). As part of this burden, the applicant must establish that he or she will more likely than not face the torture he fears "by, or at the instigation of, or with the consent or acquiescence of, a public official . . . or other person acting in an official capacity." *Id.* § 1208.18(a)(1).

If the applicant "does not contend that his predicted torture would be by or at the instigation of or with the consent of [government] officials, he must show that public officials will acquiesce in his torture." *Garcia v. Holder*, 746 F.3d 869, 873

(8th Cir. 2014). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). "A government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but it does cross the line into acquiescence when it shows willful blindness toward the torture of citizens by third parties." *Ramirez-Peyro v. Holder*, 574 F.3d 893, 899 (8th Cir. 2009) (quoting *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007)).

Here, the record contains no evidence that a public official in Mexico would acquiesce in the torture of the petitioners.

## C. *Motion to Reopen*

Finally, the petitioners argue that the Board abused its discretion in denying their motion to reopen due to changed country conditions in Mexico. They assert major changes both in country conditions and in their personal lives between the original hearing and the time of their motion. Specifically, they note that gang members murdered Juan Pablo—the main source of past violence and threats against the petitioners. They contend that his murder has intensified their fear because "his persecution of them and their familial relationship to him simultaneously provided a form of protection from the other gang members and criminal elements in Mexico." Pet'rs' Br. at 15.

We review the Board's denial of a motion to reopen for an abuse of discretion. *Kucana v. Holder*, 558 U.S. 233, 242 (2010). "The [Board] abuses its discretion if its decision is without rational explanation, departs from established policies, invidiously discriminates against a particular race or group, or where the agency fails to consider all factors presented by the [noncitizen] or distorts important aspects of the claim." *Quecheluno v. Garland*, 9 F.4th 585, 588 (8th Cir. 2021) (second alteration in original) (quoting *Caballero-Martinez v. Barr*, 920 F.3d 543, 549 (8th Cir. 2019)).

-16-

"Motions to reopen removal proceedings are disfavored because there is a strong public interest in litigation finality." *Singh v. Garland*, 93 F.4th 1086, 1089 (8th Cir. 2024) (internal quotation marks omitted). The Board may grant an untimely motion to reopen "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material." *Id.* (quoting 8 C.F.R. § 1003.2(c)(3)(ii) (2020)). We have recognized that "[t]hese new facts must be such that they would likely change the result in the case." *Id.* (internal quotation marks omitted). "The [Board] does not abuse its discretion when it determines that new evidence, even if previously unavailable, is not likely to change the outcome of the proceedings, for example, because it is cumulative." *Id.* (internal quotation marks omitted).

Here, the Board found that the evidence attached to the motion to reopen was merely cumulative. General evidence that Mexico has ongoing problems with violence and kidnappings does not show a change in country conditions. Additionally, Juan Pablo's death eliminated reasonable fear of persecution or torture from him.

Nor have the petitioners raised a meritorious due process claim.

> Even if [a] hearing contained fundamental errors, it is axiomatic in this Circuit that an alien's due process claim must demonstrate both a fundamental procedural error and prejudice. To establish prejudice, [the petitioner] must show the outcome of the proceeding may well have been different had there not been any procedural irregularities.

*Ramirez v. Sessions*, 902 F.3d 764, 772 (8th Cir. 2018) (cleaned up). Here, the petitioners argue:

> The Board fundamentally misunderstood this situation and instead used the death of Juan Pablo as equating to an automatic lack of

-17-

reasonable fear on Petitioners' part. This in itself constitutes error as a matter of law, an unreasonable factual conclusion unsupported by substantial evidence, and/or a violation of due process.

Pet'rs' Br. at 35. But this argument does not mention any *procedural* errors committed by the Board; instead, the argument concerns a disagreement with the Board's decision. Additionally, the petitioners cannot demonstrate prejudice because they failed to demonstrate eligibility for relief.

## III. *Conclusion*

Accordingly, we deny the petition for review.

_____